## No. XXIX.

### HENRY AUSTIN v. EDMUND ANDREWS, ADMINISTRATOR.

#### (See Note 28.)

*Appeal from Brazoria County.*

BAYLOR, JUSTICE.—In this case the appellant, Austin, obtained an injunction enjoining an execution sued out against his property on a twelve months' bond, as it is commonly called.

On a motion to dissolve the injunction for want of equity, the facts agreed on by the counsel of the parties are as follows: "The original judgment in the court below of Andrews, administrator, etc., v. Austin, was founded on a note bearing date the 24th of November, A. D. 1836, and it was admitted at that time, and also at the maturity of the note, there could be no forced sale by a creditor of the property of his debtor for less than two-thirds of its appraised valuation. The property of Austin was levied on and offered for sale, but not selling for two-thirds of its valuation, it was sold on a credit of twelve months, under the act of Congress of January 26, 1839, and was bought in by Austin's agent; bond was given pursuant to the act of Congress above mentioned; at the maturity of the twelve months' bond, the money not being paid, execution was sued out on it, and an injunction was obtained enjoining this execution.

"The district judge sustained the motion to dissolve the injunction, and decreed that the complainant, Austin, should pay the costs," etc.

From this decree Austin appealed, and assigns for error:

1. That the law in force at the time the contract was made, as to its enforcement, constituted the obligation of the contract.

2. That at the time this contract was entered into, the maker of the note was bound to pay the money or to let his property be sold under execution for the amount, provided that it should not be sold for less than two-thirds of its appraised value.

3. The act of Congress directing a sale on a credit of twelve months ought not to be construed to have a retrospective action, so as to embrace prior contracts.

The only question presented for our consideration by the assignment of errors we think may be narrowed down to a single point—and that is, how far does the law which was in force at the time the contract was made and fell due, as to its enforcement, constitute the obligation of the contract?

It may be well to observe, before we proceed to dispose of this question, that the note sued on was executed and became due after the adoption of the Constitution. This consideration will enable us to

---

jurisdiction and to adopt rules and mode of appeal when the statute is deficient. Wheeler v. State, 8 T., 228; Teas v. Robinson, 11 T., 774; St. Clair v. Hotchkiss, 28 T., 474; Simmons v. Fisher, 46 T., 126, 131; Vance v. State, 34 T. Cr., 395, 399.

decide this matter with all the light thrown on it by the adjudications of the courts in the United States. The clause contained in our Constitution which prohibits Congress from passing any law impairing the obligation of contracts is also found in the Constitution of the mother country; and it may be added there is not a single clause of the Constitution of that country which has given rise to more acute and vehement controversy, and the nature and extent of whose prohibitory force has called forth more ingenious speculation and more animated juridical discussion. What is a contract? What is the obligation of a contract? What is impairing a contract? To what classes of laws does the prohibition apply? These and many other questions of no small nicety and intricacy have vexed the legislative halls as well as the judicial tribunals of that country with an uncounted variety and frequency of litigation and speculation.

The learned judge, Mr. Justice Story, from whom many of the foregoing observations are taken, in his commentaries upon these various questions, remarks as to the impairing of the obligation of contracts: "Although there is," says he, "a distinction between the obligation of a contract and a remedy upon it, yet if there are certain remedies existing at the time when it is made, all of which are extinguished by new laws, so that there remain no means of enforcing its obligation and no redress, such an abolition of all remedies, operating in presenti, is also an impairing of the obligation of such contract. But every change or modification of the remedy does not involve such a consequence. No one will doubt that the Legislature may vary the nature and extent of remedies, so always that some substantive remedy be in fact left. Nor can it be doubted that the Legislature may prescribe the time and modes in which remedies may be pursued. The obligation to perform a contract is coeval with the undertaking to perform it. It originates with the contract itself and operates anterior to the time of performance. The remedy acts upon the broken contract and enforces a pre-existing obligation, and a State Legislature may discharge a party from imprisonment upon a judgment in a civil case of contract, without impairing the Constitution; for this is but a modification of the remedy, and does not impair the obligation of the contract." If these principles be correct, of which we have no doubt, they are decisive of the point under consideration. The Act of January 26, 1839, operated only as a modification, or change of the remedy, and this it was competent for Congress to do.

The complaint, however, in this instance comes from the debtor, Austin; but we see no good reason why the principles here established

---

Note 20.—Mills v. Waller, p. 416.

Generally fraud is a question of fact for the jury. It can not be presumed unless the circumstances are so strong and pregnant that no other reasonable conclusion can be drawn from them. Paxton v. Boyce, 1 T., 317; Briscoe v. Bronaugh, 1 T., 326; Bryant v. Kelton, 1 T., 415; Turner v. Lambeth, 2 T., 365; Tompkins v. Bennett, 3 T., 36; Graham v. Roder, 5 T., 141; De Leon v. White, 9 T., 598; Linn v. Wright, 18 T., 317; Baldwin v. Peet, 22 T., 708; Layton v. Hall, 25 T., 204; Van Hook v. Walton, 28 T., 59; Giddings v. Steele, 28 T., 732; Weisger v. Chisholm, 28 T., 780; Gerhard v. Neese, 36 T., 635;

should not embrace the debtor as well as the creditor. The act of Congress of 1839 was, as to him, but a modification or change of the remedy upon his broken contract, which we have already said was competent for that body to do. This evil, if indeed it be one, he might easily have averted by the payment of a just debt.

It is therefore ordered, adjudged and decreed, that the judgment of the district court be affirmed with costs.

## No. XXX.

### HIRAMS & DONAHO v. COIT.

#### (See Note 29.)

*Appeal from Liberty County.*

HUTCHINSON, JUSTICE.—The appellee filed his petition against the appellants, asserting title in a league of land in Tarquenton's prairie between the Trinidad and San Jacinto; that his title began by occupancy as a frontier settler, which was consummated by a grant from Charles S. Taylor, special commissioner for putting into possession and issuing titles to settlers on the frontier; that the appellants by collusion and fraud procured a grant for the same league; and praying decree for the land and that the adverse title should be canceled. There were plea, answer in chief, and response to interrogatories appended to the petition; documentary evidences of the conflicting titles, and oral evidence in several depositions. The cause was conducted as one in chancery and a decree rendered in favor of Coit for the land and vacating the defendants' claim as fraudulent.

We have carefully inspected the whole, and though we are satisfied that the most if not all of the proof within the power of the parties is now before us, yet from the variety and occasional conflict of the evidence, we deem it safer and more conducive to a satisfactory determination of the controversy to remand the cause with directions to have tried, by a jury in the county where the land is situated, such issues as may seem best calculated to enable the court below to pronounce its decree. It is therefore unnecessary to attempt a determination of the various and very important questions which in a most impressive and able argument of the counsel have been urged.

There was an objection made to the appeal bond, which, if sustainable, would have resulted in a dismission of the appeal. The statutes on the subject of such a bond are essentially remedial and must be liberally interpreted and applied. The chief object of such a bond is

King v. Russell, 40 T., 124; Kerr v. Hutchins, 46 T., 384; Sparks v. Dawson, 47 T., 138; Mathis v. Oberthier, 50 T., 329; Flanagan v. Oberthier, 50 T., 379; Weaver v. Ashcroft, 50 T., 427; Peiser v. Peticolas, 50 T., 638; Bibber v. Mathis, 52 T., 406; Scott v. Alford, 53 T., 82; Eicks v. Copeland, 53 T., 581; Morrison v. Clark, 55 T., 437; Ellis v. Valentine, 65 T., 532; Rohrbough v. Leopold, 68 T., 254; Elser v. Graber, 69 T., 222; Wylie v. Posey, 71 T., 34;

to afford to a creditor, whose demand is adjudged or decreed, security and indemnity for the delay and expense of prolonged litigation; and hence it is required to be in double the amount adjudged or decreed. Here the petition avers the land to be worth $20,000; but its actual value is neither ascertained nor decreed, whilst the land itself is required to be restored, and that remains a permanent security for itself. There is no pecuniary measure for the penalty of the bond afforded by the decree except the costs, the intermediate rents not having been put into contest. The omission of the name of an obligor in the body of a bond, when it is duly signed by him, although sometimes the subject of judicial cavil, forms no substantial objection to it. According to a clear and very impressive maxim of the Roman code, which when put in harmony with other important principles, should be of universal approbation—"as one binds himself, so shall he be bound." His signature sufficiently assures us of his intention.

Before awarding the issues contemplated, it is proper to declare a principle of equity practice, which in the trial of those issues ought to be observed by the court and jury. To the petition are appended interrogatories to be answered by the defendants. Hirams answered them. In his reply to more than one, after responding to the subject of interrogation, he proceeds to introduce matter not introduced in the question; as, for example, he gratuitously introduces himself as the purchaser of John Berry's improvement and occupancy. The well established rule is this, that what a party, in answer to discoveries prayed, responds directly in reference to the subject of the prayer or interrogation, it is to become evidence; the answer is then considered responsive and not excursive. But when in the answer anything not embraced by the prayer or interrogation is obtruded, it is to be disregarded. It can not avail the respondent, unless he has an equivalent allegation in his pleading and introduces proof aliunde to sustain the averment.

One of the difficulties, that have prevented a decision of the cause in this court, is that the resolution of the Mexican government of April and August, 1828, referred to in the thirty-second section of the Decree of Coahuila and Texas, No. 272, of March 26, 1834, can not be found to be consulted; and it is hoped the counsel may have access to them on a new trial.

This cause came on to be heard on the transcript of the record herein in the District Court of Liberty County; and the same being inspected and the arguments of counsel heard, because it seems to the court that sundry issues ought to be sent and tried by a jury in the said district court, it is therefore ordered and decreed by this court, that the decree

Schmick v. Noel, 72 T., 1; Bluntzer v. Dewees, 79 T., 272; Compton v. Marshall, 88 T., 50; Baxter v. Howell, 7 T. C. A., 198; Cooper v. Friedman, 23 T. C. A., 585; Granrun v. Rea, 24 T. C. A., 299; Dutton v. Clear, 26 T. C. A., 547. May be presumed from indebtedness at time of conveyance. Briscoe v. Bronaugh, 1 T., 326. Gross inadequacy of price leads to presumption of fraud. Mills v. Waller, Dal., 416; Briscoe v. Bronaugh, 1 T., 326; Bryant v. Kelton, 1 T., 415. Possession by vendor after sale is prima facie presumption of fraud. Bryant v. Kelton, 1 T., 415; Morgan v. Republic, 2 T., 279;

rendered herein be set aside; that this cause be remanded; that the court below do submit to the verdict of a jury the following issues: 1. To whom did John Berry transfer his improvement and occupancy of the land in controversy, whether to Campbell Berry or to the defendant Hirams; or whether he abandoned the land? 2. What title, if any, has the plaintiff to the land; is it fair and valid, or otherwise? 3. What title to the land has the defendant Donaho, if any; is it fair and valid or otherwise? 4. What effect, if any, had the agreement and relation between the defendants upon the title of Donaho? Let the court below upon these issues instruct the jury as to the laws governing the matters involved, and by the aid of the verdict proceed to decree finally as to law and equity may appertain. It is also considered here, that all the evidence heretofore heard by the court below and sent up in the transcript, including the answers of Hirams that are responsive to the interrogatories to him, be used on the trial of the issues with such other oral testimony as the parties may produce. It is farther ordered and decreed here, that the appellants recover their costs in this behalf in this court. Let this revisory decree be certified below for observance.

*Reversed and remanded.*

---

# JANUARY TERM, 1842.

### No. I.

### JONES v. A. P. NOWLAND.

*Appeal from Fort Bend County.*

HUTCHINSON, JUSTICE.—Nowland, by the name of A. P. Nowland, for the use of James Perry, administrator of the estate of A. McCoy, sued Jones on his note to him for $404.90, bearing interest at 12½ per cent until paid. It is copied in the petition, has no date, and there is no allegation as to its date or place of origin. As is usual in transcripts coming here, the papers in the case are copied without any introductory matter by the clerk showing when they became of record by being filed in the court. We are even left to suppose that the suit was instituted on or about the 15th April, 1839, from the date of the citation. At April term, 1839, the defendant pleaded that he did not promise to pay the note as alleged. At the fall term, 1839, the de-

---

McQuinnay v. Hitchcock, 8 T., 33; Converse v. McKee, 14 T., 20; Linn v. Wright, 18 T., 317; Mills v. Walton, 19 T., 271; Gibson v. Hill, 21 T., 225; Van Hook v. Walton, 28 T., 59; Hamburg v. Wood, 66 T., 168; Edwards v. Dickson, 66 T., 613; Peters Saddlery Co. v. Schoelkopf, 71 T., 418; Traders Nat. Bank v. Day, 87 T., 101. Fraud may be proven by circumstances or by presumptive

fendant "moved to set aside the suit on the ground that the defendant had been garnished to answer to what money he owed to A. P. Nowland." Probably at that term he also pleaded the nonprofert by the plaintiff of his letters of administration. At the spring term, 1840, he filed a general demurrer to the petition; at that term the court overruled the demurrer and gave judgment for the plaintiff for his principal and 5 per cent interest from July 1, 1838, until paid, with costs. The judge in a separate paper certifies his reasons for overruling the demurrer and giving only 5 per cent interest; but the testimony, if any was given, is not certified, and no disposition seems to have been made of the pleas and motion to set aside the suit. Such is the transcript in review.

Yet these proceedings occurred before the Legislature had attempted to give us a jurisprudence better understood by the courts, the bar and the people than that in use, and at a period when the country itself was in the process of formation; so that manifold allowances are to be indulged.

We take it for granted, too, that the presiding judge, in giving judgment only to the demurrer, could not have been apprised of the other pleas in the case. We also presume there was evidence to fix the time and place of the origin of the note and to regulate the rate of interest; but we must pass on the record as it is exemplified for our inspection.

According to the civil law, each party had the privilege of two distinct allegations in order to the presentation of the questions of law and of fact arising; the petition and the answer and the allegations corresponding to the replication and rejoinder for the introduction of new matter of excuse, of avoidance, and the like.

In practice it was necessary to present matters a limine litis and have them determined prior to the introduction of the merits upon the facts. In this case this rule was reversed by the counsel. The first plea was to the merits; the second plea at a subsequent term sought to raise a point of law; and the third, at a later term, questioned the legal sufficiency of the whole petition. Profert of the letters administrative to the beneficiary in the suit was not even proper. The defendant had no right to raise any question as to Perry's authority as administrator. He was not the plaintiff. Nowland, the payee, in whom was vested the legal interest, was properly suing, and it was immaterial to the defendant for whose use he sued. The court correctly overruled the general demurrer to the petition; but the error was in this, that after determining that matter, a jury ought to have been called to try the issue of fact. Indeed the second and third pleas ought to have been disregarded,

evidence. Briscoe v. Bronaugh, 1 T., 326; Graham v. Roder, 5 T., 141; Thompson v. Shannon, 9 T., 536; Walcott v. Brander, 10 T., 419; Burch v. Smith, 15 T., 219; Van Hook v. Walton, 28 T., 59; Rider v. Hunt, 6 T. C. A., 238. Purchaser is not affected by fraudulent intent of his grantor, if he had no notice of it. Pierson v. Tom, 1 T., 577; De Leon v. White, 9 T., 598; Fowler v. Stoneum, 11 T., 478; Sydnor v. Roberts, 13 T., 598; Snow v. Hawpe, 22 T., 168; Shearon v. Henderson, 38 T., 245; Collins v. Cooke, 40 T., 238; Flanagan v. Oberthier, 50 T., 379; Cavanaugh v. Peterson, 47 T., 197; Wagon Works v.

stricken from the record, as coming too late. The motion to set aside the suit because of the garnishment should have been rejected. Its matter was the proper subject for a plea, or answer in chief.

This cause coming on to be heard on the transcript of the record in the District Court of Fort Bend, and it being inspected and the arguments of counsel heard, because it seems to the court here that there is error in the judgment below, it is considered by the court here that the said judgment be reversed; that the cause be remanded; that the parties be allowed to amend their pleadings with a view only to have the merits of the case decided; that the appellant recover of the appellee his costs in this court, and this decision be certified below for observance.

*Reversed and remanded.*

## No. II.

### WHITING v. TURLEY.

#### (See Note 30.)

*Appeal from Travis County.*

HUTCHINSON, JUSTICE.—Turley sued Slocomb and Whiting for that he, at their request, furnished and built for them a fence of 223 panels at $6 per panel; that they in consideration promised to pay him the amount, etc. The petition contained another demand in account. Slocomb and Whiting were both cited and pleaded in one plea, "not guilty, jointly or severally." It was proved that Turley contracted with Slocomb to furnish the materials, etc., at the price, not naming in what currency—Whiting not mentioned—the contract being with Slocomb alone; that at the time Slocomb was not Whiting's partner, but was working for him on hire; that the fence was built by Turley; the witnesses varying as to its quality and value. It is certified that there was no evidence that Slocomb was either the partner or agent of Whiting, or that Whiting had any interest in or knowledge of the transaction. The jury assessed $204.18¾ for Turley and found that there was no partnership between Slocomb and Whiting at the contract; that Whiting was justly bound for the sum assessed; that they had no evidence that Slocomb induced Turley to believe he was acting as agent at the time of the contract; and that the contract was made by Slocomb. After this verdict, and before reasons in arrest of judgment, Turley's counsel moved the court to permit him to dismiss as to Slocomb, and to give judgment against Whiting. This motion was in writing. Two reasons in arrest of judgment were filed: Misjoinder of defendants; the verdict irresponsive to the issue—contradictory of the plaintiff's

Tidball, 59 T., 291; Publishing Co. v. Johnson, 68 T., 273; Le Page v. Slade, 79 T., 473; Brackenridge v. Cobb, 85 T., 448; Watkins v. Sproull, 8 T. C. A., 427; Richardson v. Lewis, 4 App. C., sec. 42; Ranney v. Hogan, 1 U. C., 257. Must be a purchaser for value. Lewis v. Castleman, 27 T., 407; Belt v. Raguet, 27 T., 471; Tuttle v. Turner, 28 T., 759; Collins v. Cooke, 40 T., 238; Brown v.

allegations—inherently contradictory; and that there could not be judgment against Whiting. The court allowed the nolle prosequi moved, and gave judgment against Whiting. He appealed. The counsel for the appellant insists it was error not to have sustained the reasons in arrest of judgment, and that there was no evidence on which to charge the appellant; and the counsel for the appellee contends that the verdict responded to the allegations; that the nolle prosequi was correct, and the judgment good. It was a favorite object of the Constitution to have introduced the body of the English common law as being in the language of our people and a code to which mostly they had been accustomed. It was at length introduced so far as consistent with the Constitution, our statutes, condition and institutions; but the act of adoption was concurrently qualified by another, abolishing the common law system of pleading and requiring suits to be by petition and answer as theretofore; thus, on the subject of the pleadings, leaving us to find principles and criteria in a language generally unknown to us. Now at common law a civil prosecution embraces various parts or divisions. First, the process and bail, then the pleadings, then the postea including trial, then the judgment, the execution and the appeal, or writ of error. The pleadings are only the graphic allegations of the parties in order to the decision of the questions of law and trial of the matters of fact arising. It must be plain to every one that we are constrained for the reasons given to confine the last named statutory provision to a strict interpretation; and hence the written averments of the cause of action, of the defense of what pertains to a presentation for determination of the matters in controversy, and those only, are not to be regulated by the common law, but referred to the doctrines and jurisprudence coming to us through Coahuila. Herein we must obey the legislative will and endure as long as we may the constant perplexities that in consequence annoy and delay us at each step.

Among the principles of the common law as understood and practiced at its introduction, and not discarded as pertaining to the pleadings, are those governing the form, the parties to the action, and the proceedings of the petition and answer.

In regard to the form, this was clearly an action at law to have compensated in damages a breach of contract, and not a remedy in chancery for the redress of infracted equitable rights. If the liability was joint it was incumbent on the plaintiff below to sue all who were liable to him. If the contract had been joint and several, he might have sued any one or all. If the defendants had been partners, he might have sued such of the partners as were known to him, and the nonjoinder of

---

Hedge Co., 64 T., 396; Steffian v. Bank, 69 T., 513; Kerr v. Oppenheimer, 20 T. C. A., 40. Protected only to extent of value paid up to time of notice. Tillman v. Heller, 78 T., 597; Cleveland v. Butts, 13 T. C. A., 272. Assignee of an option is not protected as an innocent purchaser against the fraud of his asignor. O. & P. L. Co. v. Tell, 95 T., 586. The sale is void if the purchaser had notice of the fraud, though he paid value. Moseley v. Gainer, 10 T., 393; Walcott v. Brander, 10 T., 419; Fowler v. Stoneum, 11 T., 478; Edrington v. Rogers, 15 T., 188; Wright v. Linn, 16 T., 34; Mills v. Howeth, 19 T., 257;

a dormant or unknown partner could only have been the subject of a plea a limine. Slocomb and Whiting were here sued, not as partners, but as individuals on an assumed joint liability. This was an election by Turley of defendants from which he could not recede. He was bound to know for whom he furnished the materials and did the work and to whom he gave credit, there being no partnership trusted. Even in the instance of a joint and several liability, having made the election of whom to sue, he must abide it. The action being ex contractu, he could not, in England, discontinue as to either of several sued, until process of outlawry; and here when that proceeding would not comport with our polity he could not discontinue, until after the return of at least one (perhaps two) citations non est inventus. But in all actions on contract where several are sued and are arrested or cited, they are brought into court, and it is incumbent on the plaintiff to make out a case to charge them. This is the general rule, to which there are the exceptions of infancy, coverture, etc.

It is otherwise in actions ex delicto, for obvious reasons. How far our statute of amendments may relax these principles of the common law it is not material now to decide. It allows all amendments in the proceedings, *before verdict,* that shall seem necessary to reach the merits between the parties. Whether in its utmost extension as a remedial provision, it may before verdict allow a defendant misimpleaded to be dismissed, or a new defendant introduced, we do not here determine. We all concur that in this case the discontinuance, after verdict, was a discontinuance of the action. The jury found that the contract was with Slocomb; he, therefore, was clearly chargeable. If, too, Whiting was liable, as found, the plaintiff's case was made out, and he ought to have proceeded to judgment against both; but in regard to him the verdict is uncertain and unsatisfactory. It finds, what is in conflict with the conclusion, that he is liable; that he was not Slocomb's partner; that Slocomb's agency (if there was an agency) was not disclosed, and that the contract was with Slocomb. Changes of parties in chancery depend on reasons arising out of the peculiar jurisdiction of that court; as for instance it is one of its principles, that having cognizance of one branch of a transaction it will take jurisdiction of the whole, and call before it all persons concerned, so as to determine the whole at once and finally, thereby preventing multifarious and vexatious litigation.

It may be proper to notice passingly the provision in the statute requiring the district judge to proceed in the first instance to try the cause as at law, and if he can not succeed in the effort, then to ascend the

Humphries v. Freeman, 22 T., 45; Castro v. Illies, 22 T., 479; Weisiger v. Chisholm, 22 T., 670; Baldwin v. Peet, 22 T., 708; Garahy v. Bailey, 25 T. Supp., 294; Weisiger v. Chisholm, 28 T., 780; Eliot v. Whitaker, 30 T., 411; Gaston v. Dashiell, 55 T., 508; Greenleve v. Blum, 59 T., 124; Traylor v. Townsend, 61 T., 144; McKinnon v. Lumber Co., 63 T., 30; Brown v. Hedge Co., 64 T., 396; Ellis v. Valentine, 65 T., 532; Blum v. Simpson, 66 T., 84; Tillman v. Heller, 78 T., 597; Mixon v. Symonds, 2 T. C. A., 629; Worsham v. Vignal, 14 T. C. A., 324; Bank v. Martin Brown, 20 T. C. A., 52; Kerr v. Oppenheimer, 20 T. C. A., 140; Koch v. Bruce, 20 T. C. A., 364; Hall v. Harga-

woolsack and cancel it! A volume might be filled with disquisitions upon the meaning and scope of the provision. A hundred judges, in almost any conceivable case, might differ in some degree as to its interpretation and exact function. Possibly it may mean this, that in the development of what are to be adjudicated in the cause, if the judge consider them as more properly determinable according to the course and powers of a court of chancery, he may allow the pleadings and parties to be so changed as to accomplish the object; but if so, still there ought to be put on record his order for the change, so that if illegal or improvident, it may be revised; uniformity in the application of the act is impossible. The exertion of the undefined power given is dangerous, because by the transition from the common form the trial by jury is so far evaded as to leave its intervention to the option of the judge. In this case there was no resort to this statute. The case is still where it began at law; and the nolle prosequi can not be repaired.

We all concur that there was no sufficient evidence on which to support the judgment against Whiting. It must be totally reversed.

*Reversed and remanded.*

## No. III.

### WILLIAM HART v. AUGUSTUS W. KING.

#### (See Note 31.)

*Appeal from Bowie County.*

JONES, JUSTICE.—This is an appeal from a judgment of the District Court of Bowie County, rendered at the fall term of said court in the year 1841. The suit was instituted by the plaintiff Hart against the defendant King upon two promissory notes, executed by the defendant's testator in his lifetime to the plaintiff. At the trial term of the court the defendant, by his counsel, entered the plea of nil debet, and immediately thereafter filed a general demurrer to the plaintiff's petition, upon which the following judgment was rendered: "This cause coming on to be heard on demurrer, the defendant craved oyer of the notes, which was refused by the plaintiff. The cause was then heard on demurrer, which demurrer was sustained by the court. It was therefore ordered, etc." It is difficult to discover upon what grounds the demurrer to the plaintiff's petition was sustained, unless they may be explained by the bill of exceptions in which is contained the following sentence: "The defendant verbally craved oyer of the plaintiff of the notes upon which the suit was brought, which was refused by the plaintiff.

dine, 23 T. C. A., 149; Blankenship v. Turner, 3 App. C., sec. 427. Or if he has notice of facts sufficient to excite the suspicion of a prudent man and put him upon inquiry. Mills v. Howeth, 19 T., 257; Humphries v. Freeman, 22 T., 45; Garahy v. Bailey, 25 T. Supp., 294; Edmundson v. Silliman, 50 T., 106; Scott v. Alford, 53 T., 82; Cox v. Miller, 54 T., 16; Blum v. Simpson, 66 T., 84; Blum v. Simpson, 71 T., 628; Dodd v. Gaines, 82 T., 429; Ratto v. Bluestein, 84 T., 57; McConnell v. Bruggerhoff, 1 App. C., sec. 1005; Bailey v. Carrington, 3 App. C., sec. 179; Scheuben v. Wheeler, 4 App. C., sec. 211. No-

Whereupon the court ordered that unless plaintiff would comply with defendant's request aforesaid, the demurrer should be sustained, which was accordingly sustained."

The only reason assigned by the district court for rendition of judgment upon the demurrer is the plaintiff's refusal to the defendant of oyer of the notes upon which suit was brought. The refusal to give oyer of the notes, after issue joined on the part of the plaintiff, is sustained by the law, whilst the judgment on demurrer is erroneous.

The demand of oyer is a species of pleading, and should be made before issue joined—otherwise the court should permit the cause to go to the jury, or give judgment for the plaintiff if the defendant waive a jury. In this case the district court might have overruled the demurrer and required the defendant to go into trial under his plea of nil debet, when the plaintiff would produce the notes as evidence of the indebtedness of defendant's testator. This course would give the defendant all the advantage which he could have gained by a demand of oyer at the proper stage of the proceedings.

The common law has long since settled that oyer of an agreement, note or other instrument, not under seal, can not be craved; and if the defendant improperly demand it, the plaintiff should be allowed to proceed as if no such demand had been made; but where the court may deem it necessary, it will, before issue joined, by analogy of the doctrine of oyer, order that the plaintiff permit the defendant to have an inspection, and copy of the instrument sued upon.

If the district court had given an order to the plaintiff to produce the notes for the defendant's inspection in the present case, before an issue was rendered and accepted, the appellate court would not have questioned the exercise of a discretion which might have directed such order.

The court can not discover from any inspection of the record any legal ground, upon which judgment should have been rendered by the district court for the defendant upon his demurrer to the plaintiff's petition, or for the order that the defendant should have oyer of the notes sued upon at the time of the demand.

It is therefore of opinion that the judgment of the District Court of Bowie County is erroneous, and that the same be reversed, and that the cause be remanded for further trial upon the merits.

*Reversed and remanded.*

---

tice to agent is notice to principal. De Leon v. White, 9 T., 598. A subsequent bona fide purchaser for value is not affected by the fraud of his vendor. Sydnor v. Roberts, 13 T., 598; Barnes v. Hardeman, 15 T., 366; George v. Watson, 19 T., 354; Johnston v. Smith, 21 T., 722; Hardy v. Broaddus, 35 T., 668; Link v. Page, 72 T., 592. While inadequacy of price in any case is a circumstance to be considered in determining the question of fraud, it is not of itself sufficient proof. Burch v. Smith, 15 T., 219; Moore v. Lowery, 27 T., 541; Brown v. Texas Cactus Hedge Co., 64 T., 396. But it may be such as to only require very slight evidence and it may be so gross as to be decisive evidence of fraud. Edrington v. Rogers, 15 T., 188; Burch v. Smith, 15 T., 219; McFaddin v. Vincent, 21 T., 47; Chamblee v. Tarbox, 27 T., 139. At civil law, inadequacy of half the value is sufficient to avoid the sale. Briscoe v. Bronaugh, 1 T., 326.

## No. IV.

### Fulton v. Craddock.

(See Note 32.)

*Appeal from Red River County.*

BAYLOR, Justice.—Craddock, the plaintiff in the court below, brought this action against Fulton, as the surviving partner of the firm of Cravens & Fulton, to recover the value of a quantity of corn which he charges in his petition was fraudulently obtained by the firm of Cravens & Fulton from one Tomlinson, by collusion with him whilst acting as Craddock's agent to sell the corn.

The fraud alleged is that Tomlinson was individually indebted to the firm of Cravens & Fulton, and for the purpose of securing the payment of their debt, they purchased, contrary to law and good conscience, the corn of Tomlinson, knowing it to be the property of the plaintiff Craddock. This cause was reversed at the last term of the court on an appeal taken from the District Court of Red River County, mainly on the ground that the facts upon the record did not in our opinion justify the jury in finding a verdict for the plaintiff below.

It is again brought here by Fulton, as the surviving partner of the firm, in order to reverse the case and set aside a second verdict in favor of Craddock.

Upon an inspection of the record and looking into the testimony, we find the proof, although contradictory, to be somewhat stronger in support of Craddock's right to recover; under such circumstances the court will presume (especially after several verdicts) that the jury, who are the proper triers of the facts, have found correctly; we can not therefore disturb the verdict. This is required by the genius and spirit of our laws; if it were otherwise, courts might render juries useless, and usurp the power of ascertaining facts which according to the principles of the Constitution belong to juries in a court of law.

The bill of exceptions taken in the case presents two other questions for our determination:

1. Was the motion to continue the case properly overruled by the judge below?

2. Was the instruction asked for to the jury properly refused?

Upon the first point in looking into the affidavit for a continuance and examining the facts there set forth, we do not find such an abuse of the *legal discretion* given to the district judges to continue causes as to raise the question whether this court will interfere in such cases or not.

Upon the second point the defendant's counsel moved the court to

---

**Note 21.**—Hill v. McDermot, p. 419.

Courts do not take judicial notice of laws of another State or country, and they must be alleged and proved as other facts. Huff v. Folger, Dal.,

instruct the jury, that as the plaintiff had not prayed for any specific relief in his petition, that he could not therefore recover against the defendant. The petition after stating the cause of action concludes, "to the damages of the plaintiff five hundred dollars, and therefore he brings his suit," etc.

This we deem in the present form of action quite sufficient. At all events the objection came too late after the cause had been submitted to the jury.

The court therefore, in refusing the instruction asked for, decided correctly.

The judgment must be affirmed.

*Affirmed.*

## No. V.

### HYRAM SADLER v. LINDLEY JOHNSON

*Appeal from Red River County.*

OCHILTREE, JUSTICE.—This case has been twice decided by the tribunals authorized by law to decide cases, where "persons can not agree to a division line of any land which has never been surveyed agreeably to law." After a deliberate investigation of all the facts contained in the record, we are unanimously of opinion that the judgment of the court below shall be affirmed.

*Affirmed.*

## No. VI.

### WILLIAM BUTLER v. WILLIAM MORETON.

*Appeal from Red River County.*

JACK, JUSTICE.—This is an appeal from Red River County. It was a contest between the parties as to the right of location to a tract of land originating under the seventeenth section of the land law. It was first tried before a justice of the peace and six jurors. It was then taken by certiorari into the district court. In both instances the appellee was there successful.

No bill of exceptions accompanies the record—no principles of law are involved—it is purely a question of fact; and although the testimony which is presented to us is neither conclusive nor satisfactory, we are unwilling to disturb the verdict. The judgment of the court below conforms to the verdict. Let it be affirmed.

*Affirmed.*

530; Cooke v. Crawford, 1 T., 9; Crosby v. Huston, 1 T., 203; Bryant v. Kelton, 1 T., 434; Smith v. Smith, 1 T., 621; Ramsay v. McCanley, 2 T., 189; Jones v. Laney, 2 T., 342; Hill v. George, 5 T., 87; Trigg v. Moore, 10 T., 197; Able v. McMurray, 10 T., 350; Sadler v. Anderson, 17 T., 245; Anderson v. Anderson.

## No. VII.

### B. M. Ballard v. J. H. Rogers and J. J. Ward.

(See Note 33.)

*Appeal from Red River County.*

HEMPHILL, Chief Justice.—This is an appeal from the decree of the District Court of Red River County. J. H. Rogers, one of the appellees, had recovered judgment on a promissory note against the appellant, B. M. Ballard, and J. J. Ward, the other appellee in this case. On the rendition of the judgment, the appellant B. M. Ballard applied to the judge of the district court, sitting in chancery, for a writ of injunction to restrain the issuing of execution on said judgment; the prayer of complainant's petition was granted; but on demurrer being filed by defendant, the same was sustained by the court, the injunction dissolved, and the complaint of petitioner dismissed. From this decree the plaintiff has appealed to this court.

Our deliberations and decision will be confined to the matters directly involved in the appeal. The duty is not imposed on us of laboring through the mass of improprieties and irregularities in which the proceedings, previous to the complainant's bill in chancery, are involved. Were we disposed to censure, sufficient matter of reproof would be furnished from the record after the institution of the suit in equity. We waive, however, the reprehension which might properly be bestowed on some portion of the proceedings in this case, and limit ourselves to the discussion of the grounds of appeal.

The petition of the appellant, praying for a writ of injunction, has been attentively considered by this tribunal, and we are of opinion that the matters contained therein are not sufficient to authorize the issuing of the extraordinary writ of injunction. The petitioner does not allege that he was deprived of the opportunity of making his defense, or that his defense was of such a nature as to be inadmissible in the courts of common law. Nor does he allege or show any matter whatsoever which could possibly justify the court of chancery in interfering with the judgment of a court of co-ordinate jurisdiction.

We are of opinion, therefore, that there was no error in the decree of the district court sustaining the demurrer to the appellant's bill of complaint; and it is ordered, adjudged and decreed that the judgment of the court below in this case be and the same is hereby affirmed.

*Affirmed.*

---

23 T., 639; Armendiaz v. Serna, 40 T., 291; M. K. & T. Ry. Co. v. Cocreham, 10 T. C. A., 166; Western Union Tel. Co. v. Russell, 12 T. C. A., 82; Rosenthal Millinery Co. v. Lennox (T. C. A.), U. R. C., 1899. Written laws of other countries must be proven by authenticated copies, but unwritten may be proven by oral testimony. Hill v. McDermott, Dal., 419; Burton v. Anderson, 1 T., 93; Smith v. Smith, 1 T., 621; Martin v. Payne, 11 T., 292; Ellis v. Wiley, 17 T., 134; Mexican Nat. Ry. Co. v. Ware (T. C. A.), U. R. C., 1900; Dumas v. State, 14 T. App., 464; Patterson v. State, 17 T. App., 102. Practice in Texas

## No. VIII.

### ROBERT HAMILTON v. A. H. McKENSIE.

**(See Note 34.)**

*Appeal from Red River County.*

HÉMPHILL, CHIEF JUSTICE.—The appellee recovered judgment against the appellant at the fall term of the court in the year 1840. No notice of appeal was given at the term of the court, and no bond filed according to the requisition of the law. The appellant, who was the defendant in the court below, made application for a writ of injunction, which was accordingly issued; but at the spring term of the court in the year 1841 the injunction was dissolved and petition dismissed for want of equity in its averments. At that term of the court a motion was made to set aside the judgment rendered on the common law side of the court at its former term, and for a new trial on various grounds. The motion was overruled, and from an instrument under seal, which was doubtless intended for an appeal bond, this court is authorized to conclude that an appeal was taken.

The first question which presents itself is whether the court has jurisdiction of the cause.

The motion for a new trial was not made at the term when judgment was rendered, but at a subsequent session of the court. From the examination of the provisions of our laws in relation to new trials, we are satisfied that the motion therefor must be made before the rising of the court at which judgment has been given. We are therefore of opinion that no appeal having been taken within the terms prescribed by law, we can not take into consideration any of the various matters presented on the record, and that the case should be removed from the docket, and it is accordingly so adjudged and decreed.

*Dismissed.*

## No. IX.

### A. H. McKENSIE v. ROBERT HAMILTON.

*Appeal from Red River County.*

MILLS, JUSTICE.—The petition in this case is addressed to the judge acting as chancellor, and contains in substance the following averments: "The appellant, McKensie, upon a certain contract or agreement entered into between himself and Hamilton, made an assignment to Hamilton of his headright certificate of one-third of a league of land, which agreement is as follows: 'Agreement entered into between A. H. McKensie

---

to permit intelligent Mexicans to testify as to construction of laws of Spain and Mexico. State v. Cuellar, 47 T., 295; State v. De Leon, 64 T., 553. Col-

on the one part and Robert Hamilton on the other part, witnesseth, that said McKensie agrees to let said Hamilton have his headright certificate of one-third of a league of land to locate on Red River, for which said Hamilton is to let said McKensie have the same quantity of land out of claims to be located by Allen Urquart out on or near the Cypress, he, the said McKensie, paying his portion of expense on the same. Said McKensie is to have choice of either end of the 'largest claim set out.' This agreement is dated the 28th of May, A. D. 1838. Hamilton, by the assignment, became possessed of the certificate mentioned, and procured it in the month of August of the same year, to be located upon lands situated in Red River County and bordering on the Red River. Hamilton has ever since, that is to say, from the month of August, A. D. 1838, up to 'the spring term of the District Court for the County of Red River (at which the petition of appellant was filed), enjoyed the possession of said land, covered by said headright certificate of McKensie. Hamilton has never located, or caused to be located in his behalf, any lands out or or near the Cypress, but after obtaining the certificate of McKensie, withdrew from the hands of Urquart the claims referred to in his agreement with McKensie, and has otherwise than as contemplated by said agreement disposed of them. His negligence in perfecting the agreement has not only deprived McKensie of obtaining his land in an eligible portion of the country, but of all equivalent or compensation whatever for his headright certificate. The bill or petition concludes, that by reason of the fraudulent conduct of Hamilton, the agreement should be canceled, the agreement annulled and the certificate restored, as well as that the land, by virtue of the same located and surveyed, should be adjudged to be the property of the complainant."

The defendant Hamilton, by attorneys, demurred to the petition or bill of the complainant and set forth as grounds for so doing the following causes: (1) The bill does not declare that complainant ever tendered his portion of the expense as per agreement; (2) the bill shows McKensie to have had his remedy at law; and (3) that a venue is not sufficiently set out; concluding with a prayer for judgment.

The demurrer was sustained and bill dismissed; from which judgment of the court below the complainant appeals.

It is unnecessary for the court at this time to enter into a definitive construction of the argument between the parties to this suit; we have only to say that as regards the first exception to the bill, in the demurrer suggested, by reference to the contract or agreement it will be observed,

---

lections of laws of other countries, purporting to be printed and published by authority of such countries, are admissible to prove themselves. Burton v. Anderson, 1 T., 93; Martin v. Payne, 11 T., 292; Ellis v. Wiley, 17 T., 134; Texas Express Co. v. Beissner, 1 App. C., sec. 762; Patterson v. State, 17 T. App., 102; Fernandez v. State, 25 T. App., 538. Nature, validity, obligation, construction and interpretation of contracts are determined by the lex loci contractus, unless a different place is fixed by the parties for performance. Tinnen v. Mathews, Dal., 491; Huff v. Folger, Dal., 530; Scott v. Maynard, Dal., 548; Gautier v. Franklin, 1 T., 732; Hays v. Cage, 2 T., 501; Snoddy v. Cage, 5 T., 106; Andrews v. Hoxie, 5 T., 171, 189; Campbell v. Wilson, 6 T., 379, 390; Raymond v. Holmes, 11 T., 54; Hall v. Harris, 11 T., 300, 305; McLeod

that no *tender* was contemplated until the services were performed by Hamilton, to wit, the location of the lands on the Cypress; and the bill declares those services as yet unperformed. This objection to the bill is therefore invalid.

Upon the second cause of demurrer we would remark, that the fact of the fraud being such as might well form the subject for compensation by damages before a jury is not sufficient answer to a bill in chancery praying for relief by the remission of a contract. This we conceive to be a point well settled both in England and the United States; for as the court remarks in the case of Bogus Executor v. Grundy, 3 Peters, 210, "The law which abhors fraud does not permit it to purchase indulgence, dispensation or absolution." In the opinion of the court the allegations of the bill, if proved or confessed, are declaratory of fraud, and a fraud of that character which would justify the interference of a court of equity; whether the specific judgment prayed for by the complainant could well be founded upon them, is a question which we are not now called upon to decide.

The third and last point taken in the demurrer is "that there is not a sufficient venue set out." The suit was commenced in the county of Red River, and it was brought as well for the rescission of the agreement as to validate an equitable right to and obtain possession of the land. By reference to the bill it will be seen that the land is described as lying and being in the county of Red River. The fifth section of the act defining the powers and jurisdiction of the district court, passed December 22, 1836, Texas Laws, volume 1, page 194, declares "that no individual shall be sued other than in the county of his residence," with various exceptions; one of which is in the language of the statute, "Where land is the object of the suit." The venue is only to give the court jurisdiction, so far as the exercise of the same is confined to a particular territory. This bill is filed before "the Hon. John M. Hansford, judge and chancellor of the District Court for the Seventh Judicial District, next to be holden at Clarksville, within and for the county of Red River." This we conceive to be entirely sufficient.

We are unwilling, owing to the unsettled practice in the country both at law and in equity as regards demurrers, by this decree to determine that the demurrer filed in this case was intended by the appellee to be a confession on his part of all the allegations in the bill. (And we would remark that parties, pleading to any petition at law or in equity filed against them, should at once file every matter either of law or fact which they may deem necessary to this defense; and it will hereafter be the practice of this court to proceed as if such had been the case in the court below. We are compelled to the adoption of this rule to prevent the

v. Board, 30 T., 238; Cantu v. Bennett, 39 T., 303; Weider v. Maddox, 66 T., 372; Life Assn. v. Harris, 94 T., 25; Apollos v. Staniforth, 3 T. C. A., 502; Merrielles v. State Bank, 5 T. C. A., 483; Tilliard v. Hall, 11 T. C. A., 381; M. K. & T. Ry. v. Thompson, 11 T. C. A., 658; M. P. Ry. v. Harris, 1 App. C., sec. 1265. By place of performance. Ryan v. M. K. & T. Ry., 65 T., 13; Seiders v. Life Assn., 93 T., 194; Life Assn. v. Harris, 94 T., 25; Good v. Cald-

otherwise great delay in the prosecution of suits to final judgment.)   We are therefore of opinion that the judgment of the court below should be reversed and the case remanded for further trial—the appellee having the privilege of answering further to the allegations of fact contained in the bill.   And it is hereby so ordered and declared.

*Reversed and remanded*

## No. X.

### REPUBLIC OF TEXAS V. WILLIAM YOUNG.

(See Note 35.)

*Appeal from Red River County.*

BAYLOR, JUSTICE.—William Young, the appellee in this case, in the year 1838 applied to the board of land commissioners for the county of Red River for a certificate of headright for one league and labor of land, and obtained the same; which certificate the investigating board of land commissioners, appointed by an act of Congress passed January, 1840, condemned as fraudulent; from this decision Young appealed to the District court, and there prayed that the judgment of said investigating board might be reversed, and that a certificate be issued to him for one league and labor of land.

The petition of the appellee, in order to sustain his claim to the land, contains the necessary and usual allegations required by the Statute; denies all causes of forfeiture, etc.; and among other things avers that Young in the month of November, in the year 1835, being a married man and the head of a family, was a resident citizen of the State of Mississippi; that he was there possessed of real and personal estate; that he sold all of the former and so much of the latter as he could not with convenience transport, with the intention of becoming a resident citizen of Texas; that in the month of February, 1836, he arrived in the county of Bowie, in said Republic, where he determined to domiciliate himself; that he remained in said county from February, 1836, until the middle of the month of March of the same year, when he returned to the State of Mississippi for the purpose of removing his family to the said county of Bowie, and returned with them to said county in the month of November, 1836.

That during the time of his absence from the State of Mississippi until his return, to wit, from the month of January, 1836, until the month of October of the same year, the family of the said petitioner were visiting their relations, and had no other home than that of the said Young; that he considered Texas his home from February, 1836, until

well, 11 T. C. A., 515; Applebaum v. Bates, 3 App. C., sec. 167.   If to be partly performed in different States, intention of parties governs.   Ryan v. M. K. & T. Ry., 65 T., 13.   Seems that marriage contracts are an exception to general rule of lex loci contractus.   Shreck v. Shreck, 32 T., 578.   If subject of contract is land, the lex loci rei sitas governs.   A mortgage executed without the State, contrary to its laws of public policy, is void.   Cantu v. Bennett, 39

the present time. Upon an issue joined traversing the facts, the jury gave Young a verdict, and a judgment was rendered thereon in his favor in the court below, from which judgment the Republic appealed.

The question for our determination is, could Young from the foregoing statement of facts be considered as *residing* in Texas on the day of the declaration of independence, as the head of a family, so as to entitle him, within the provisions of the Constitution, to his headright for one league and labor of land.

The jury having found for the petitioner, we are authorized to conclude that the facts are as stated by Young; that he was in the Republic as a resident citizen on the day of the declaration of independence; that he arrived in it a short time before that eventful period and left for Mississippi shortly thereafter, with a view of bringing his family on to Texas. These facts being established, we think that the petitioner, both by the Constitution and the law as it then existed, is entitled to land as a headright claimant.

It was contended in argument that as Young was in the Republic so short a time before the declaration of independence, and having quitted it immediately thereafter, he could not be considered as domiciliated in Texas and therefore ought not to have the land claimed by him. The question of domicile is often a very delicate and nice one. In consulting the authorities, however, on this point, we find one of the rules as to domicile to be this: It is of no consequence in such a case how short his residence may have been, for it is the *fact* coupled with the *intention* that settles his *domicile*. And here the jury have substantially found both that Young was not only a resident citizen of the Republic on the day of the declaration of independence, but that he was so at that time with the intention of remaining (animo manendi). This made Texas instantaneously his place of domicile. He was therefore entitled to land as an emigrant; and the only remaining question is, to what quantity, as his family was at that time in the State of Mississippi, without any fixed habitation. Mr. Justice Story, in his fourth rule on this subject states (page 44, Conflict of Laws), "that a married woman follows the domicile of her husband." This results from the general principle that a person who is under the power and authority of another possesses no right to choose a domicile. The absence, therefore, of the wife, at the time alluded to, especially as she had no fixed home in the State of Mississippi, could not affect the petitioner's right as to the quantity of land he was entitled to by the Constitution and law then in force. From these con-

---

T., 303; Fowler v. Bell, 90 T., 150. Contract valid under lex loci contractus is valid everywhere, unless in contravention of lex fori. If void under lex loci contractus, void everywhere. Andrews v. Hoxie, 5 T., 171, 189; Shelton v. Marshall, 16 T., 344; Ryan v. M. K. & T. Ry., 65 T., 13; Weider v. Maddox, 66 T., 372; Fowler v. Bell, 90 T., 150; Tuckett v. Herdic, 5 T. C. A., 690; T. & P. Ry. v. Davis, 2 App. C., sec. 191. If lex loci contractus is not alleged and proved, lex fori will be applied. M. K. & T. Ry. v. Cocreham, 10 T. C. A., 166. Whether a writ is wrongfully sued out, is determined by the laws of the State where it was obtained. Wiley v. Trawick, 14 T., 662. Where husband and wife move from one State to another, title to property acquired before removal is determined by the laws of the former. Parks v. Willard, 1 T.,

siderations, coupled with the fact that Young has ever since remained with his family in Texas, we are of opinion that the judgment ought to be affirmed.

*Affirmed.*

## No. XI.

### THOMPSON, MORTON AND PAYNE V. WILEY HARRISON.

#### (See Note 36.)

*Appeal from Red River County.*

JACK, JUSTICE.—This was an action brought in the District Court by Harrison, administrator of Joseph Thompson, against the defendants in the court below, to recover $800 upon a note executed by them and made payable to William Walker, and by Walker indorsed to plaintiff's intestate. The defendants pleaded failure of consideration and alleged "that the note sued on was given as a wager upon the election of a member of Congress." The jury found for the plaintiff. The statement of facts shows, "that it was admitted by the plaintiff that the consideration was a bet won upon a county election for members to Congress." It was also admitted on both sides "that the parties to the note were all citizens and freeholders of the county." The court instructed the jury "that the consideration was sufficient in law to entitle the plaintiff to recover. That betting upon an election was an exercise of judgment and not so manifestly contrary to public policy as to authorize the courts to declare it so!" To this charge of the court to the jury the defendants excepted.

We have examined the authorities cited by appellants, and abundant others are to be found establishing the principle that contracts of this kind are contrary to good morals and against public policy.

Vide 2 Pothier on Obligations, Appendix, p. 6; 1 Term Rep., 56, 60. Allen v. Heam, 7 Johns., 434; Mount and Wardell v. G. and R. Waite.

The judgment of the district court must be reversed.

*Reversed.*

## No. XII.

### A. C. HORTON V. R. JONES

#### (See Note 37.)

*Appeal from Matagorda County.*

HUTCHINSON, JUSTICE.—It is not necessary farther to state the case than that Horton filed his bill to enjoin a judgment obtained by Jones against him. Jones answered, denying the equitable matters contained in the bill; but not reserving exceptions by way of demurrer to

---

350; Warren v. Dickerson, 3 T., 460; McIntyre v. Chappell, 4 T., 187; Nimmo v. Davis, 7 T., 26; Avery v. Avery, 12 T., 54; Vardeman v. Lawson, 17 T., 10; Walace v. Burden, 17 T., 467; Hawkins v. Lee, 22 T., 544; Powell v. De Blanc,

any insufficiency in the bill in not laying a ground for equitable interposition by showing causes that prevented defense at law. The answer simply negatives the facts constituting the equity in chief and puts no grounds of demurrer.

The answer was filed a few days before the term at which the case was decided, and plainly too late to enable the plaintiff to get the witnesses in the same county, or the depositions of more distant witnesses in support of the bill and in opposition to the answer. We do not go so much on the affidavit for a continuance, for we have not yet decided whether the refusal of a continuance may be assigned for error, but the affidavit evinces the wish of the plaintiff to have the case stand over in order to proof, and it were due to justice to permit it.

When an answer is perfectly responsive in a bill for injunction and in negation of its equity, it is proper to dissolve the injunction; but then the judgment—plaintiff must be required under the statute to give a refunding bond, if the complainant wish the bill to stand over as an original bill. Here the case ought to have been continued to enable the plaintiff to prove, if he might, the matters of his bill denied by the answer, and the respondent should have been ordered to give the refunding bond as a condition precedent to obtaining the benefit of his judgment at law. Let the decree be reversed and the cause be remanded, with permission to the parties to take testimony.

*Reversed and remanded.*

## No. XIII.

### SLOO & BYRNE V. POWELL AND OTHERS.

#### (See Note 38.)

*Appeal from Matagorda County.*

HUTCHINSON, JUSTICE.—This is a voluminous case terminating in one question, arising upon the act regulating attachments, of January 28, 1839.

On the 23d February, 1839, the appellants as a mercantile firm filed their petition, alleging that Powell, on the 24th January, 1837, made three promissory notes to Foster, due at sixty, ninety and 120 days, for sums that amounted in principal to $3962.13; that they were indorsed by the payee to the plaintiffs, who deposited then in the Commercial Bank of New Orleans for collection; that at their maturity respectively, due diligence through a notary was exerted in order to charge the maker and indorser, the evidences whereof are exhibited; that the time of suing, Foster, the indorser was itinerant, without domicile, but then in Matagorda Bay, with goods enumerated, on board the schooner Texas, part of

23 T., 66; Keyser v. Pilgrim, 25 T. Supp., 217; McCulloch v. Renn, 28 T., 793; Oliver v. Robertson, 41 T., 422; Blethen v. Bonner, 93 T., 141; Burnham v. McMichael, 6 T. C. A., 496; Clardy v. Wilson, 24 T. C. A., 196. Title to property given to either of them while migrating from one State to another is

which goods were in the possession of Belknap, a citizen of that county, who had colluded to alter the manifest of the goods or ship, so as to make them appear to be his; and praying that Powell, Foster, Belknap, with Shackelford, the master of the schooner, should be impleaded; presenting interrogatories to the two latter persons; that an attachment should be issued; that the defendants should be decreed to pay the amount, etc. Byrne, one of the plaintiffs, on the same day (February 23, 1839) made affidavit as the basis of the attachment against the goods, and gave a bond, with a surety, payable to *all* of those impleaded, with condition substantially conforming to the bond prescribed in the statute referred to.

On the same day citations were issued, all of which were served; and an attachment against Foster's estate was also issued, and on the day following was levied. On May 31, 1839, Foster replevied the goods by giving bond of that date to both plaintiffs in the penalty of $8000. At October term, 1840, the bond to prosecute the attachment was quashed and a new bond ordered to be given nunc pro tunc; and the exceptions taken to that action of the court shows that the ground assumed for quashing was that the bond was not given alone to the actual defendant, Foster. There was a motion to quash the attachment but it was overruled. On the 16th October, 1834, the new bond required was given by Byrne as principal, with a surety in the penalty of $8000, payable to Foster, his heirs, etc., and to be void on condition such as is prescribed in the attachment law. On the 6th October, 1841, on the seventh and eleventh days of that month successively, the court below quashed the last bond, on the ground that it was not signed by all the plaintiffs; from which they prayed an appeal. The attachment was quashed for want of sufficient bond, and it was decreed that the plaintiffs should recover of Powell and Foster the amount of the notes with interest on each, from their maturity, with costs. The only question raised in the court below or presented on the brief of the counsel for revision here is, whether the district court erred in quashing the last bond.

The suit originated at a period when the Spanish law, based on the civil law was in force here; and it is manifest from the verbiage of the attachment and of both bonds, that the act concerning attachments of the 28th January preceding, was promulgated at Matagorda and was before the counsel of the plaintiff at the filing of the petition.

It will be recollected, too, that the principles of the English jurispru-

---

determined by the laws of the latter. State v. Barrow, 14 T., 179. Property acquired while temporarily sojourning in another State is determined by the laws of their domicile. Edrington v. Mayfield, 5 T., 363. Purchaser of wife's separate property from husband, or through execution sale against him, with notice of wife's rights, takes no title against her. Parks v. Willard, 1 T., 350; Bennett v. Cocks, 15 T., 67; Smith v. Boquet, 27 T., 507; Kirk v. H. D. N. Co., 49 T., 213; French v. Strumberg, 52 T., 92; Morrison v. Clark, 55 T., 437; Baker v. Baker, 55 T., 577; Cline v. Upton, 56 T., 319; John v. Battle, 58 T., 591; Legierse v. Moore, 59 T., 470; Parker v. Coop, 60 T., 111; McKamey v. Thorp, 61 T., 648; Ross v. Kornrumpf, 64 T., 391; Kempner v. Comer, 73 T., 196; Montgomery v. Noyes, 73 T., 203; Evans v. Welborn, 74 T., 530; Parker v. Fogarty, 4 T. C. A., 615; Clardy v. Wilson, 24 T. C. A., 196. If purchaser has no notice of wife's rights, he takes a good title against her. Mitchell v. Marr, 26 T., 329; Cooke v. Bremond, 27 T., 457; Kirk v. H. D. N. Co., 49 T.,

dence regulating the course of civil prosecution, and separating the ordinary from the extraordinary form, had not been introduced. The court had cognizance of the subjects or matters of the complaint; and as the parties have stirred no other question here, we may proceed singly and at once to inquire, was the last bond valid under the attachment law? We think it was, and that the court below erred in quashing it.

The inquiry leads us into an examination of the first bond, and the disposition made of it. By the law existing when it was given, a plaintiff might implead all the persons connected with the transaction, and was not put on the strict rule of the common law requiring that in an action ex contractu only those bound or liable should be sued, and those, too, liable in the same degree. Here as well the maker as the indorser of the notes were sued; and so were Belknap and Shackelford upon alleged interest in the goods of Foster, or fraud and collusion with him concerning them. We are therefore not prepared to say that the first bond was such as afforded the principal defendant, Foster, no available security. Indeed we believe that in view of the law then prevailing it was valid security, so that although the court below erred in quashing it, there was no error in the refusal to quash the attachment; and as the security required by the defendant Foster was afforded by the new bond ordered by the court, he ought to have been contented with it, especially if in all other respects it conformed to the requisitions of the attachment act and was such as his motion recognized as good. It is true, as urged by the appellee's counsel, that attachment laws whose operation is in rem, being mostly ex parte, should receive a rigid interpretation, and should not be applied to cases not within their plain and obvious meaning. It is also true that at common law one partner can not bind his associate without his consent, by signing the associative name to a seal; for in that case, only he who signs is bound. And though this rule did not apply to the bond in question, it may be conceded that the name of Byrne, as in favor of the obligee, did not in any degree bind Byrne's partner. By the act, however, the party or his agent, attorney or factor might take the oath required to obtain the attachment; and if the agent, attorney of factor might make the affidavit, assuredly one of the plaintiffs might make it. So, too, with the bond. It was allowed to be given by the plaintiff, his agent, attorney or factor; and if it was sufficient for a third person as agent, attorney or factor to give it, was there, or can there ever be, any reason why one of the plaintiffs should not give it? What was the object? To furnish the adverse party a collateral security that should be sufficient. It could never be pretended that either of the obligors could

213; McKamey v. Thorp, 61 T., 648; Ross v. Kornrumpf, 64 T., 391; Rousel v. Stanger, 73 T., 670; Stiles v. Japhet, 84 T., 91; Kirby v. Moody, 84 T., 201; Coleman v. Bank, 94 T., 605; Russell v. Nall, 2 T. C. A., 60; Sanburn v. Schuler, 3 T. C. A., 629; Sinsheimer v. Kahn, 6 T. C. A., 143; Swink v. League, 6 T. C. A., 309; Watts v. Corner, 8 T. C. A., 588; Coleman v. Bank, 17 T. C. A., 132; Hord v. Owens, 20 T. C. A., 21; Kilgore v. Graves, 2 App. C., sec. 410; Ross v. Dailey, 1 U. C., 251. Must be a purchaser for value. Barnes v. McArthur, 4 T. C. A., 71. Purchaser who is a creditor of husband and credits amount of bid on judgment, is not an innocent bona fide purchaser as to the wife. Deles-

ever urge as an objection to a recovery on the bond that the partner of the principal obligor was not joined. In Cayce v. Curtis and Cayce v. Horton, January, 1841, we decided that a seal was not required to render an instrument given as a statutory bond obligatory, previous to the introduction of the body of the common law; and that as the party had chosen to bind himself, so he should be bound. Holding it proper to give a strict construction to the act, we yet consider that under its third section, if either or any of several plaintiffs executes a good and formal bond, with sufficient surety or sureties, it is a security *by* the plaintiffs, although *all* of them do not sign as principals; and is as available a statutory security as if given or furnished by an agent, attorney or factor. Foster had been cited, had replevied the goods attached, and as the object of the process was to bring him into court or reach his property, it was too late to move to quash the attachment at the term next after the return term. The statute authorizes a plea in abatement, and that ought to have have been filed at the first term. A motion to quash is indeed in the nature of that plea and ought to be made with equal diligence. We are not prepared, however, to say that if a plaintiff in an attachment case is prepared and offers to give such bond as the court may require for the perfect security of the defendant, and if this be done previous to the decision of such motion or plea, it ought not to be received. The current of modern decisions seems to allow it to be done generally, because the object of the bond is to secure collaterally the obligee, and because there should be but one suit, if possible, on the same demand or complaint. If a defendant in an attachment be not cited, we should proceed with strictness and vigilance for his security.

The appellants, therefore, on these principles must be restored to their rights under the levy of attachment and replevy bond; but as the case has not been tried on a plea to the merits, but has been decided erroneously in part below on preliminary questions, the judgment must be set aside and the cause remanded. We will not omit noticing that in the judgment rendered it was particularly proper not to compound the interest, but to give judgment for it from the dates of the maturity of the notes, respectively, until payment.

*Reversed and remanded.*

Concurred in by Chief Justice John Hemphill, Judge R. E. B. Baylor and John T. Mills. Judges R. Morris and C. P. Jack dissenting.

---

pine v. Campbell, 52 T., 4; Wallace v. Campbell, 54 T., 87; Bonner v. Stephens, 60 T., 616; McKamey v. Thorp, 61 T., 648; Stoker v. Bailey, 62 T., 299; Ross v. Kornrumpf, 64 T., 390; Yoe v. Montgomery, 68 T., 338; McCutchen v. Purinton, 84 T., 603; Russell v. Nall, 2 T. C. A., 64; Cleveland v. Mills, 6 T. C. A., 479; Burnham v. McMichael, 6 T. C. A., 496; Cobb v. Trammell, 9 T. C. A., 527; Brown v. Marwitz, 10 T. C. A., 458; Mexia v. Lewis, 12 T. C. A., 102; Aultman v. George, 12 T. C. A., 457; Ryan v. Engelson, 26 T. C. A., 192.

**Note 22.**—Andrews v. Andrews, p. 427.

An appeal does not lie from an interlocutory decree or judgment nor from a judgment that does not settle all the issues as to all of the parties. Soy v. McMullen, Dal., 363; Robinson v. Bailleul, 2 T., 160; Ewing v. Kin-

## No. XIV.

### SELKIRK v. BETTS & CO.

(See Note 39.)

*Appeal from Matagorda County.*

HUTCHINSON, JUSTICE.—Betts & Co. made their note to McLellan of November 2, 1839, payable at one day. After maturity it was assigned to Selkirk, having credits on it reducing it to $178.16. The assignee sued the makers to recover that residue. They pleaded payment before suit, without stating to whom. The court instructed the jury that a set-off or failure of consideration was a good defense against the assignee suing on a note assigned to him after its maturity, and that in regard to any promise made to the assignee after transfer to pay the note to him, it was a new contract on which he should have sued, so that the testimony on that score should be disregarded. The jury found that the makers were entitled to a set-off, at or before the transfer of the note, to $208.13, but that after transfer they promised the holder to pay the note. The judgment on this verdict was for the costs of the defendants. Without noticing specially the points presented on the brief of the learned counsel, we will state the principles we think applicable to the case. The Act of 1840, concerning negotiable instruments, discounts and set-offs, should not have been consulted as the rule of decision. Legislation affecting rights can not be retrospective, though enactments changing the remedies may be enforced upon pre-existing rights. The rights of these parties were and still are determinable according to the civil law, because the note and evidences of payment or set-off on the transcript seem to have arisen prior to the act mentioned, and to that introducing generally the English common law.

The suit was well brought on the note. It was not necessary for the plaintiff to have noticed any subsequent promise of the makers to pay its amount or the balance to him; on the contrary, if the defendants had actually paid the note to the payee before notice of transfer, testimony of the fact would have been admissible under the plea of payment pleaded, and evidence of the promise would have been good countervailing proof if it had been made by the defendants when not under mistake of the facts or of their rights. If the defendants relied on a cross-demand, matured against the payee before notice of assignment, they ought to have pleaded it, so as to have notified their adversary. He then could have replied the subsequent promise to pay him or given evidence of it. In reference to the requisites of the allegata, a promise to pay a debt barred by prescription, or a statute of limitation, or a promise to pay to the assignee or

---

nard, 2 T., 163; Gross v. McClaran, 8 T., 341; Hicks v. Gray, 25 T., 82; Martin v. Crow, 28 T., 613; Simpson v. Bennett, 42 T., 241; Taylor v. Fore, 42 T., 256; Rodrigues v. Trevino, 54 T., 198; Linn v. Arambould, 55 T., 611; Whitaker v. Gee, 61 T., 217; Bradford v. Taylor, 64 T., 169; Wootters v. Kauffman,

holder of a chose in action is not a new contract, nor is there any need for a new or cumulative cause or consideration to support it, although it has been sometimes so decided; it is only a recognition of a subsisting obligation, for in the one case, though the remedy is precluded by lapse of time, the morality of the duty to be performed remains; and in the other, the party is presumed to have either no defense or to have waived the assertion of it.

In the case before us the court below erred in permitting evidence of a counter demand without an allegation on which to support it; in charging the jury that the plaintiff ought to have averred the promise to pay the note; and in not instructing the jury in regard to the traits necessary to give vitality to such promise. Such promise in order to be effectual must be understandingly made. If the makers of this note when ignorant of the fact of an existing cause of cross-action, or when laboring under a delusion or misconception of their right to avail of it, promised payment to the holder, it was precisely such a promise as no just law ought to enforce; but if made upon knowledge of the fact and of their right, it gave efficacy to the note in the hands of the holder, and the makers must resort to the payee, their debtor on their account. This principle of the Roman, Spanish, English, and we may say American law, is too firmly established to be controverted. It has been adopted as a doctrine of Texian jurisprudence in the case of Hall v. Phelps, January, 1841. The judgment, therefore, must be reversed and the cause remanded.

This cause coming on the heard on the transcript of the record in the District Court of Matagorda, and it being inspected and the arguments of counsel heard, because it seems to the court here that there is error in the judgment below, it is therefore considered that the same be reversed; that this cause be remanded, with discretion to the said district court to allow the appellees to plead farther to the merits, and thereupon to try the cause upon the principles in this court declared; and it is further considered that the appellant recover of the appellees his costs herein in this court expended; and that this decision be certified below for observance.

*Reversed and remanded.*

67 T., 488; Lumber Co. v. Williams, 71 T., 444; Mignon v. Brinson, 74 T., 18; M. P. Ry. v. Scott, 78 T., 360; Darnell v. Lyon, 85 T., 455, 465; Land Co. v. Winter, 93 T., 560; R. R. Commission v. Weld & Neville, 95 T., 278 (overruling R. R. Commission v. Weld & Neville T. C. A., U. R. C., 1902); Mills v. Paul, 1 T. C. A., 419; Mills v. Paul, 4 T. C. A., 503; State National Bank v. Waxahachie National Bank, 14 T. C. A., 143; Davis v. Martin, 15 T. C. A., 62; Walker v. Mears, 28 T. C. A., 210; Lay v. Bellinger, 1 App. C., sec. 24; Giersa v. Yocum, 1 App. C., sec. 310; Stephenson v. Tennant, 1 App. C., sec. 543; Wheeler v. Davis, 3 App. C., sec. 13; Carswell v. Crowther, 4 App. C., sec. 153; White v. Smith, 4 App. C., sec. 225; Wadley v. Johnson, 2 U. C., 739; Masterson v. Williams (T. Sup.), U. R. C., 1889; Frank v. Tatum (T. C. A.), U. R. C., 1892; Burch v. Burch (T. C. A.), U. R. C., 1894; Burrows v. Cox (T. C. A.), U. R. C., 1896; Davis v. Martin (T. C. A.), U. R. C., 1896. In such cases, appellate courts will dismiss the appeal on its own motion. Messner v. Lewis, 17 T., 519; Holek v. Varona, 63 T., 65. When one of the defendants dies before trial, it will be presumed in favor of finality that the case was dismissed as to him. Smith v. Wilson, 18 T. C. A., 24. Appellate court may revise an

## No. XV.

### JOHN SMITH v. THE REPUBLIC.

*Appeal from Liberty County.*

JACK, JUSTICE.—The appellant, John Smith, was at the fall term of the District Court for Liberty County indicted and tried for the murder of James West. Upon the trial in the district court the defendant's counsel moved the court to instruct the jury "that the indictment was, as it was framed, an indictment for manslaughter only and not for murder," which instruction the court refused, and charged the jury "that it was an indictment for murder, and that upon the bill the defendant might be convicted of murder." To this opinion of the court the defendant by his counsel excepted.

The only question which we deem it necessary to determine in this case is, was this indictment for murder or manslaughter?

The second section of the act punishing crimes and misdemeanors provides "that every person of sound mind and discretion, who shall willfully and maliciously kill any person, shall be deemed guilty of murder," etc.

The indictment before us was framed under this statute, and containing the usual requisites, concludes with these words, "and so the jurors aforesaid upon their oath aforesaid do say, that the said John Smith, him the said James West in the manner and by the means aforesaid, feloniously, willfully and maliciously, did kill and murder."

It was well settled that an indictment under a statute must follow and conform to the statute in stating the offense.

The indictment before us we think is strictly in accordance with the provisions of the statute before alluded to. It is an indictment for murder, and the judge did not err in his charge to the jury. The judgment of the district court is therefore affirmed.

*Affirmed.*

## No. XVI.

### STOCKTON v. MONTGOMERY.

#### (See Note 40.)

*Appeal from Colorado County.*

HUTCHINSON, JUSTICE.—The main question, whether the Act of January 19, 1841, constituting the territory of Ward, conforms to the Constitution, is plainly, directly and formally presented for our determination. If we hold it to be a valid act, the territory of Ward will

interlocutory order of lower court refusing to proceed with the cause, and correct errors by mandamus. Kleiber v. McManus, 66 T., 48; Schultze v. McLeary, 73 T., 92; Grigsby v. Bowles, 79 T., 138; Fannin County v. High-

have passed through all the prescribed ordeals, and its future course as
a civil division of the nation may not be disturbed on the question now
to be adjudicated.   If a majority of this court can not validate the act,
or a majority shall decide that it is in conflict with the constitutive law,
then we are to solve a secondary proposition, whether an act passed by
the senate and house of representatives, carrying out a civil division of
the Republic, is a political act that is final, conclusive, and not receivable
by the judiciary.

1.   I will consider if the act be constitutional.   Dismissing all pre-
lude about the importance of the subject and the consequences of its
judicial solution, and desiring to bring into the investigation a mind
directed honestly, anxiously and exclusively to the question, unawed by
present or future extraneous considerations, I will speak frankly, respect-
fully and courteously of the legislative and executive branches of the
government, but always in the spirit of the maxim, "Veritas nihil vere-
tur, nisi abscondi."

Opening the Constitution and grouping the sections concerning coun-
ties and the representatives and functionaries of counties, we may more
clearly discern how they harmonize, what they establish, what they for-
bid.   "The house of representatives shall not consist of less than twenty-
four nor more than forty members, until the population shall amount to
one hundred thousand souls; after which time the whole number of
representatives shall not be less than forty nor more than one hundred;
provided, however, that each county shall be entitled to at least one
representative."   Const., art. 1, sec. 5.

"The clerks of the district courts shall be elected by the qualified
voters for members of Congress in the county where the courts are estab-
lished."   Id., art. 4, sec. 6.

"There shall be in each county a county court, and such justices'
courts as the Congress may from time to time establish."   Id., sec. 10.

"The Republic shall be divided into convenient counties, but no new
county shall be established, unless it be done on the petition of one hun-
dred free male inhabitants of the territory sought to be laid off and
established, and unless said territory shall contain nine hundred square
miles."   Id., sec. 11.

"There shall be appointed for each county a convenient number of
justices of the peace, one sheriff, one coroner, and a sufficient number
of constables," etc.   Id., sec. 12.

"The Republic of Texas shall be divided into convenient judicial dis-
tricts, not less than three nor more than eight; there shall be appointed
for each district a judge, who shall reside in the same, and hold the
courts at such times and places as Congress may by law direct."   Id.,
sec. 2.

---

tower, 9 T. C. A., 293; Schintz v. Morris, 13 T. C. A., 580.   After final judg-
ment, interlocutory may be revised on appeal.   Gross v. McClaran, 8 T., 341;
Stewart v. Jones, 9 T., 469; Stewart v. State, 42 T., 242; Holek v. Varona,
63 T., 65; O'Neal v. Bank, 64 T., 644; Fort Worth Ry. v. Rosedale Ry., 68 T.,
163.   Act of November 1, 1871 (Gammel's Laws of Texas, vol. 7, p. 17),

"Until the first enumeration shall be made, as directed by this Constitution, the precinct of Austin shall be entitled to one representative, etc.  Id., art. 7, sec. 6.

The framers of the Constitution must be understood to have employed words in their natural sense, and to have *intended what they said;* and to ascertain the powers granted or objects declared, the only rule is to consider the language of the charter granting or defining them.  All will agree to this.  It is the first process suggested to every intelligent and pure mind; it is a natural impulse; and it is a rule of judicial action declared in the great case, Gibbons v. Ogden, 9 Wheaton, 1, 5 Cond. Rep., 562.  Another rule coeval with jurisprudence is that the written positive law shall be so construed as to be rendered operative; and that that and all the provisions on the same subject shall be considered together and made to harmonize, if reasonably and justly they may; and moreover, that the utmost reasonable, just and practicable effect and scope shall be given to each.  This no one can controvert.  Now all the sections quoted are exceedingly plain.  It seems to me that no one can misunderstand them.  There is no obscurity on which to ponder and doubt.  There is no ambiguity to be explained; nor is there *now* any perceivable conflict.  There was in the formation of the instrument an accidental incongruity, but it ceased with the adoption of the instrument, and it is now wholly unimportant; it is this: the minimum of representatives in the house according to the first clause is twenty-four, and by the last it is thirty-two.  But as the last is couched in terms of limitation as well as the first, and is moreover more specific than the first, we should regard the last as declarative of the true minimum; and this, too, because it was favorable to a more numerous representation. If the Convention contemplated a period when Congress might reduce the number to twenty-four, it precluded that result by giving to the territory then embraced by the existing precincts thirty-two, until the enumeration should be made as directed by the Constitution—an enumeration nowhere indicated, unless by the first clause in order to the ascertainment of the 100,000 souls.  The minimum of twenty-four, therefore, was superseded by that of thirty-two by the instrument itself.

In every other particular the sections quoted harmonized, and each can be rendered fully operative.  The second section of the fourth article could be enforced until the population should become so immense, and the eight districts, as the highest number of judicial districts, so crowded with people and consequent litigation as to render the maximum of eight for such districts incompatible with the term *convenient,*

---

authorizing appeals from interlocutory judgments, held void.  Ward v. Ward, 37 T., 389; City of Paris v. Mason, 37 T., 447; Dial v. Collins, 40 T., 367.  Nor from an order overruling motion for new trial, nor until after final conviction.  Shannon v. State, 7 T., 492; Lawrence v. State, 14 T., 432; Burrell v. State, 16 T., 147; O'Connell v. State, 18 T., 343; Calvin v. State, 23 T., 577; Nathan v. State, 28 T., 326; Dooly v. State, 33 T., 712; Murray v. State, 35 T., 472; Fulcher v. State, 38 T., 505 (overruling Nelson v. State, 32 T., 71; Hoppe v. State, 32 T., 388); Mayfield v. State, 40 T., 289; Anschincks v. State, 43 T., 587; Young v. State, 1 T. App., 65; Smith v. State, 1 T. App., 408; Butler v. State, 1 T. App., 638; Choate v. State, 2 T. App., 302; Butler

and to require an amendment of the Constitution in order to the execution of the laws and the administration of justice. So the sixth section of that article is not only enforcible, but expressly explodes as impossible the assumption that there can be a county without a representative; for if the clerk of a district court is to be elected by the qualified voters of the member of Congress in the county where his court is established, it follows that his county must have a member in Congress, thus plainly showing what the Convention clearly expressed in the first section in review, that in all cases—as a continuous limitation and essential element in the structure of counties—"each county shall be entitled to at least one representative." The tenth section of the fourth article can operate harmoniously with the first section in giving a county court and justices' courts as the third and fourth elements of a regular county; and so of the twelfth section of the fourth article in giving other county officers as a fifth element—a sheriff, a coroner, justices and constables. Coming to the eleventh section of the fourth article, we find the sixth and seventh components of a county,—it must have at least 100 free male inhabitants, and must contain at least 900 square miles in area; these are the minima in relation to its population and territory. Now as in mathematical demonstration and physical science we say of a given space that is divisible, or of a body composed of parts, that any number of the fractions or components of the whole is not the entirety, so in constitutional law, it is an axiom that though six out of seven of the elements required to constitute an institution be given, if the seventh be denied, the institution is not created, but the attempt to form it a nullity. The act denies to the territory of Ward a separate representative, the first, the highest and the most important right of a county.

I have thus assumed as the natural sense and plain meaning of the fifth section of the first article, that each county at each period mentioned, at all times during the subsistence of the Constitution, must have at least one representative. Look again at that section. It is but one sentence. The idea it expresses is distinct and clearly the same to every intelligent reader at the first perusal. It fixes the minima and maxima of representatives during two epocha: the first, that *before* the population shall amount to 100,000, and the second, that *after* that event or attainment, and concludes with a limitation alike applicable to both; the number shall be so and so until that event, after which it shall be specified—"provided, however, that each county shall have a representative." No philologist could express the same idea or train of ideas in simpler or clearer phrase. If the limitation of the county right is to be

v. State, 2 T. App., 529; Robinson v. State, 3 T. App., 47; Lablaite v. State, 4 T. App., 169; Pennington v. State, 11 T. App., 281; Darnell v. State, 24 T. App., 6. In the following instances, judgments are not final and can not be appealed from: (a) Only for costs. Hanks v. Thompson, 5 T., 6; Warren v. Shuman, 5 T., 441; Scott v. Benton, 6 T., 322; Hancock v. Metz, 7 T., 177; Bradshaw v. Davis, 8 T., 344; Fitzgerald v. Fitzgerald, 21 T., 415; Martin v. Wade, 22 T., 224; Holt v. Wood, 23 T., 474; Green v. Banks, 24 T., 522; Neyland v. White, 25 T., 319; Patterson v. Hall, 30 T., 464; I. & G. N. Ry Co. v. Smith County, 58 T., 74; Eastham v. Sallis, 60 T., 576; American, etc., Co. v. City of Crockett (T. C. A.), U. R. C., 1899. (b) Overruling motion to

understood as applying to both epocha, as is the natural and obvious import of the words and the structure of the whole sentence, there is no need of any other word or words to be introduced by implication, for the meaning is perfect from the words used; and we have seen that according to one of the highest authorities we must adopt the natural sense of the provision. We have seen, too, that by taking the section to mean what it manifestly declares, it can operate effectually and in harmony with every other section and clause of the Constitution.

If we assume that the concluding limitative clause of the fifth section of the first article applies only to the second epocha, what follows? First, to do so, we depart from the rule of right reason declared in Gibbons v. Ogden. Secondly, we are constrained to add words to a sentence already perfect, and radically change its natural import; and that, too, to produce discord instead of harmony, for if the Convention intended the limitation to refer to the clause giving the second epoch, and to that alone, the concluding words would have been "provided that in the latter case," and not "provided, however, etc.," or some equivalent qualifying word or phrase. Thirdly, on that violent interpretation the sixth section of the fourth article would have been rendered inoperative during the first epoch; for until the population should amount to 100,000, as counties might be formed without representation, so district clerks for such counties would have to be elected by voters not entitled to elect a representative. Fourthly, as only eight judicial districts and a judge for each could be had, the judicial counties could be so multiplied as to render the official duties of the judges too oppressive to be performed, and thus under a mere coloring of the Constitution the Legislature could subvert the judiciary, when the grand object of the Constitution was to organize and perpetuate a government of three co-ordinate but independent branches. Thus the number of counties could have been extended to 104, or thirteen to each judge; and giving one week's court twice a year to each county, he would have been put in the stirrup six months each year to hold the district courts alone. But the counties could have been increased indefinitely until a national assembly should have been found sole occupants of the citadel, to make, expound and execute the law! The Convention did not open this door to encroachment. Fifthly, to show that it was intended that at all times each county should be separately represented, at the commencement no precinct was left unrepresented. Sixthly, there are four civil divisions of the Republic named, three of which are for judicial and other purposes: first, senatorial districts, one of which may consist of two or more counties, the district of a representative being only

quash writs of certiorari and attachment. Messner v. Lewis, 17 T., 519; Hamman v. Lewis, 34 T., 474; Holek v. Varona, 63 T., 65. (c) Quashing writ of sequestration. Little v. Morris, 10 T., 263. (d) Quashing indictment. State v. Paschal, 22 T., 584; State v. Thornton, 32 T., 104. (e) Order granting change of venue and order remanding case to court granting it. Wygall v. Treasurer, 33 T., 328; Vance v. Hogue, 35 T., 432. (f) Refusal to enter final judgment on verdict. Lane v. Ellinger, 32 T., 369. (g) Order of justice of peace dismissing suit for want of prosecution. Morgan v. John-

one county; then the judicial districts, to be composed of counties; then counties; and lastly company beats, or justices' precincts. So far as divisions are expressly required, none others for the same purposes can be established—for expressio unius est exclusio alterius. Those required must be organized and kept, each as nearly equal to one another as practicable, and all alike for the same purpose. Now look at the confusion of such a county as Ward. It is invested, we may assume, with a full machinery of judicial administration and internal economy and police, for so from the words of the act it would at first seem; but when its citizens assemble as electors of a representative to Congress, its own officers do not order and conduct the election, for here in one quarter of Colorado and in another Matagorda takes the power and sends her sheriff, judges and clerks of election; Ward being subjected to two extraneous powers and civil platoons of officers, and her people separated into squads, voting not for one but for two members of Congress from different counties. If such a judicial county were formed on the point of intersection of four regular counties, the confusion would be duplicated. Were these confusion and confliction of lines, powers and rights intended by the Constitution? That it was intended in fact by the Convention is perfectly incredible. But how are rights affected? Has James S. Montgomery the same privileges and benefits, arising from and protected by the Constitution and laws, that are enjoyed by any citizen of Colorado? Can he exercise and enjoy all of his constitutional and civil rights in the same degree—under equal circumstances? Plainly and certainly not. He approaches the ark of liberty—the ballot box— not in community with his compeers, with whom he actually is associated in the performance of all his other municipal and domestic relations, but in a corner and in conjunction with strangers and under a distant and separated surveillance. Not so the man of Colorado. The inequality is marked. Again, are his advantages in a county not separately represented by a member bound to utter and vindicate in the national hall the distinct interests and instructions of himself and compeers equal to those he might enjoy under such separate representation? Plainly and certainly not.

Then *all* his municipal and social rights are impaired. He is sued in Ward territory. He says he is a citizen resident in Colorado County, a civil division duly made and fully represented; but that his domicile has been unlawfully separated from it, and though he occupies the same locality, it is disfranchised. Is not this true? And what is the true name and nature of the right thus violated? It is evidently a municipal

son, 4 T., 117. (h) Order dismissing petition of intervention. Stewart v. State, 42 T., 242. (i) Order granting motion to remove cause to Federal Court. Appeal lies from refusal of motion. Rosenfield v. Condict, 44 T., 464; Durham v. Southern L. I. Cơ., 46 T., 182; Walker v. Howard, 10 T. C. A., 611. (j) Judgment against sureties alone on bail bond, and refusal of judgment on. Moore v. Schooner Anna Maria, 11 T., 655; Cox v. State, 34 T. Cr., 94. (k) Order allowing continuance. Dow v. Hotchkiss, 2 T., 471; Tinsley v. Trimble, 35 T., 425; Taylor v. Fore, 42 T., 256. (l) Granting new trial. Stewart v. Jones, 9 T., 469; Huston v. Starr, 12 T., 424; Goss v. McClaran, 17 T., 107; Dial v. Collins, 40 T., 367; Long v. Garnett, 45 T., 400;

right. The statute required his creditor to sue him in his own county. That county is Colorado, not diminished in extent by the void act in review. Hence we perceive that Ward territory is not his true civil division, not his forum, not even a constitutional entity. It is admitted by all the learned counsel who have argued the question arising that though one hundred competent men residing within the proper area concur in the voluntary abandonment of the rights and immunities resulting from an integral and fully represented county in order to enjoy them in restricted degree and different circumstances, it can not affect another man residing in the same space; and that if the act thus obtained does so affect him, this alone determines its invalidity.

For these six reasons, with others that might be offered, I feel constrained to declare my utter inability to entertain for a moment the argument, that the concluding clause of the first provision in review qualifies only the case or epoch of the section. I can not hesitate as to the entire meaning of the section and its full scope, nor can I perceive how a doubt can be held about it. But in making this conscientious declaration, I feel the most unfeigned conviction that not only a doubt may arise in another's mind with equal conscientiousness, but a different conclusion attained. I forget not the established principle of construction of a constitutional provision, that upon a reasonable doubt whether the legislation under it accords, the latter is to be supported as being compatible with the former; a principle resting on the respectful confidence to be reposed in the probity and wisdom of a co-ordinate branch of the government acting under the same solemn sanctions. But when the conviction is clear, as is mine, the duty to condemn the unwarranted legislation is imperious. The obligation of allegiance is to support the constitutive law; and that obligation is rendered eminently imperative upon this court, the last and special depository of the charter of the nation's conventional will, and its peculiar guardian against all infraction.

2. I now come to the question whether the statute before us is such an exertion of the *political* power of the legislative as excludes the judicial scrutiny and authority of the government. The immediate etymon of *political* is *politics,* which is the art and science of government; the regulation of man in his relations to the State; the theory and practice of obtaining the ends of civil society as perfectly as possible. In common speech and sense we mean by the politics of a country the course of its government in its internal and external relations, more especially the external or international; so that in its comprehensive acceptation it embraces every subject of positive law. In this last sense the act

Morehead v. I. & G. N. Ry. Co., 46 T., 178; G. C. & S. F. Ry. Co. v. James. 73 T., 12; Hamilton v. Prescott, 73 T., 565; Schintz v. Morris, 13 T. C. A., 580; Hume v. Schintz, 16 T. C. A., 512; Lay v. Bellinger, 1 App. C., sec. 23. (m) Setting aside order discharging guardian. Lehman v. Gajusky, 75 Texas, 566. But may appeal from denial of motion to set aside appointment. Arthur v. Read, 26 T. C. A., 574. Adoption of the common law by the Act of January 20, 1840 (Gammel's Laws of Texas, vol. 2, p. 177), brought with it the writ of error. Bailey v. Haddy, Dal., 376; Moore v. Harris, 1 T., 36. With us it is not the institution of a new suit but only a mode of appeal. Creek v. Rogers, 1 T., 440; Smith v. Gerlach, 2 T., 424; Luckett v. Townsend, 3 T., 119; Lacey v.

before us is a political act, as is every other act of the Legislature either with or without the concurrence of the executive, and every act of the executive in the view of what is the course of the government. But when we proceed to ascertain the essential nature of a legislative act and its concord with the Constitution, it is quite plain that this cognovit can afford no possible criterion—none conceivable! Names that represent things truly become their proper representatives and there is substance in them. Names that do not import the nature and essence of things exactly are ever delusive. They may be false simply when not producing vicious effects, fraudulently false when fraught with mischief, and in the worst degree, criminally false. In every way they are unfit for human use. "Call a spade a spade."

What is the Constitution? It is the basis on which the government rests—the authority for all law—and is the commission under which the Legislature, the executive, and the judiciary act. It is permanent and not influenced by the temper of the times. Whatever the collisions of opposite interests, the virulence of parties and the conspiracies of corruption, public robbery and treason, it continues like the Himalaya or the Andes, amidst and above the storm,—the nation's destiny dependent upon its subsistence. If a legislative act impugn its principles, the act must yield; and whenever it is brought before the court it must be declared void. Nay, the act is inherently nothing. 2 Dall., 304; 1 Cran., 175.

Its grand objects were to establish, organize and sustain a government of three co-ordinate, independent branches, each acting within a defined and fixed sphere; but the exertion of their respective powers, whether on one and the same or separate subjects, always to concentrate to the beneficial ends of national security and civil liberty; the first branch to legislate, the second to approve, and as chief magistrate to execute in general the acts of the first branch and conduct the government during its recesses; and the third in the last resort to expound and enforce the laws in every detail and particular of violated public and private right. And the Constitution, like the sun in the center of the solar system, was to hold all the planets within their orbits, sustain and vivify them, and shine equally on the inhabitants of each. This general principle may be found in Fairfax v. Hunter, Wheat., 304. In Wilkinson v. Leland it was asserted to an attentive world that no government could be scarcely deemed free when the rights of the people were left solely dependent on the will of the legislative body without any restraint. 2 Pet., 657. I am fully warranted, from these and other numerous expositions of a Constitution from which ours is mainly copied,

---

Ashe, 21 T., 394; Rodgers v. Alexander, 35 T., 116; Hart v. Mills, 38 T., 513; Magee v. Chadoin, 44 T., 488; Harle v. Langdon, 60 T., 555; Moore v. Moore, 67 T., 293; T. T. Ry. Co. v. Jackson, 85 T., 605; G. H. & W. Ry. Co. v. Lacy, 7 T. C. A., 63; Hart v. State, 13 T. App., 555.

**Note 23.**—O'Connor v. Van Homme, p. 429.

Plaintiff can not recover on quantum meruit when suit is upon a contract. San Antonio v. Lewis, 9 T., 69; Gammage v. Alexander, 14 T., 414;

to declare that the judiciary is not only a co-ordinate branch of the government, but a check interposed to keep the other branches, not indeed within the limits of a sound and safe policy or of any policy at all, for that we shall see is exclusively intrusted to the other branches, but to constrain them to keep within the letter and spirit, the requisitions, the limitations, and landmarks of the immutable constitutive law; that the exertion of this great and paramount duty is essential to the existence and transmission of freedom; and that this court is the last resort in which the rights of the people are protected, the Constitution vindicated, and the government preserved. Among the powers granted to each house of Congress are the power to judge of the election, qualification and return of its members; to adopt its rule of proceeding; to punish internal disorders; to expel a member; and to imprison persons, not members, for disrespect. In the argument these have been called *political powers;* but it is plainly a misapplication of terms. They are *exclusively constitutional powers.* Neither the executive nor the judiciary can have any possible control over either house in its execution of any one of such powers, nor directly arrest, suspend, or supervise the action or decision, *so as to coerce a different result.* How far it might be competent for the judiciary in a case presented for the writ of liberty or in one inter partes, based on the alleged violation of the constitutional and absolute right of the citizen by such decision or action, to interpose, need not be mooted before it arises; but it may be assumed that the house whose decision or action should be impugned could never be impleaded. Such is the power given to the house of representatives to prefer impeachments; and in the trial of impeachments the senate is the court of original and final jurisdiction—at once the *primary and dernier resort;* and who would dream of calling these *political* powers, and who could suppose that the exercise of them could be controlled by a co-ordinate branch of the government by asserting, suspending or supervising the result?

Coming to the powers of Congress enumerated in the second article of the Constitution, they are the prominent powers of a legislative character intrusted to be subjected to the veto of the executive or his approval. They, too, may be called exclusive. Among them, the power to declare war and grant letters of marque may be considered an exclusive political power. In another sense all legislation may be regarded as political. It is in this, that if it do not conflict with the Constitution, its policy or expediency is intangible by the judiciary; for in that case, however wild or ruinous it may be, the courts are bound implicitly to observe and enforce it. When both houses of Congress act apart from

Devoe v. Stewart, 32 T., 712; Bellew v. Casey, 60 T., 573; Jones v. Brazile, 1 App. C., sec. 299; Stubbs v. City of Galveston, 3 App. C., sec. 143; Kocher v. Mayberry, 15 T. C. A., 342. If the contract is only partly performed, recovery may be had on quantum meruit. Gonzales College v. McHugh, 21 T., 256; Carroll v. Welch, 26 T., 147; Hollis v. Chapman, 36 T., 1; Weis v. Devlin, 67 T., 507; Childress v. Smith, 90 T., 610; Sulzbacher v. Wilkinson, 1 App. C., sec. 994. Contract void under statute of frauds is basis for quantum meruit. Capers v. Stewart, 3 App. C., sec. 291.

the President, as an elective college, this is in the exertion of an exclusive constitutional power and there is nothing strictly political in the power or action. But, for example, should Congress, with or without the executive sanction, pass a revenue law taxing one section of the Republic by express provision upon a higher ratio than another; or should prescribe paper money as a tender; should require a soldiery to be quartered upon the citizens at the will of military commanders to consume their substance without remuneration, could not the judiciary interpose? I can not here do more than notice the powers of the legislative branch, and observe that by perusing the second article and glancing over the Constitution, it will be seen how very vast are those powers and how greatly they exceed those intrusted to the other branches; and when we remember that upon all matters of policy and expediency, that branch by a vote of two-thirds over the veto may be supreme, the judiciary being bound to observe and execute the legislative will, we are astounded at the contemplation, and find relief in the reflection that the people by a change of representation can remove abuses. And yet though the proportions of the powers are thus unequal, I decided at Gonzales, and continue to believe, that the scope of legislative power is still more extended. I may repeat a portion of my own opinion:

"This is a national government; and at the outset it is very important to ascertain to what degree it is limited, and to distinguish it from a federative government over independent states. To the extents, in the modes, and upon the subjects on which the Constitution speaks, it is imperious, supreme, and paramount. Thus the powers imparted to one branch are not to be exerted or usurped by another branch. The duties devolved on Congress must be performed; the restrictions upon legislation that are expressed can not be transcended, and any act, whether elective or legislative, done or passed by that body that is in conflict with any direction, prohibition or barrier interposed by that instrument, is either void or voidable according to its nature, or in the view of the necessary conservative principles that must be invoked in testing or applying it. The executive and judiciary must move alike within the orbits assigned them. Thus far it is not only safe but demonstrable, that the charter of liberty must be ever followed. But here the parallel between it and the Constitution of the United States ceases. That creates a government of conceded and limited powers; it vests in a national government not all, but only a portion of sovereignty or the general powers that pertain to government; whilst the residue of sovereignty is reserved equally to the States and the people, by whom the

---

**Note 24.**—Hall v. Allcorn, p. 433.

Retrospective laws prohibited by Constitution are such as give rights, or impair vested rights, by relation back. Sutherland v. De Leon, 1 T., 250; De Cordova v. Galveston, 4 T., 470; Paschal v. Perez, 7 T., 348; Hamilton v. Flinn, 21 T., 713; Sherwood v. Fleming, 25 T. Supp., 408; Bender v. Crawford, 33 T., 745; Moore v. Letchford, 35 T., 185; Chalk v. Darden, 47 T., 438; White v. Martin, 66 T., 340; Mellinger v. Houston, 68 T., 37; Maynard v. Freeman (T. C. A.), U. R. C., 1900; Calder v. Bull, 3 Dal., 386; Cummings v. Mo., 4 Wall., 277; Campbell v. Holt, 115 U. S., 630. Providing a remedy

Constitution itself was formed.  But the government which our Con-
stitution creates is, to all extents, in every degree, and for all purposes,
a national and not federative government.  The powers and rights not
enumerated and declared are reserved to the people; and the only sen-
sible, practicable and appreciable import of the reservation must be,
that in regard to such powers and rights they are to be exerted by the
people, *either in convention or through their senators and representa-
tives in Congress;* and until their will, in reference to any matter or
ground not occupied by the Constitution, shall be uttered in convention,
it *can be expressed in legislation.*  Let no one be alarmed at this propo-
sition.  If the fundamental law be overleaped, undermined, or even
rudely approached, the Legislature will be held in check by the judi-
ciary; or if hurtful or onerous measures or institutions be enacted, the
people by a change of representatives can have them removed."  I might
have added, for certainty to every intent, that the reserved rights of the
people can never be exerted in mobs, in Jacobin clubs, in local associa-
tions; and that nullification in Texas can only be revolt against the
Constitution and government.

The conjunctive, exclusive powers vested in the President and sen-
ate to make treaties and to appoint ministers abroad and certain officers
at home, you may call *political,* if you choose, on the maxim of the re-
markable man, who asserted constantly with a solemn asseveration,
*"there is policy in everything!"*  Here, too, no one could pretend any
controlling, restraining or revising power of the judiciary to arrest or
suspend the action of the President and senate or to abrogate a treaty.
But if a conflict between a treaty and a constitutional, vested, absolute
right of a citizen should be properly brought before the proper court;
or should the quo warranto be resorted to, to divest the franchise of an
officer unconstitutionally obtruded on the country by the exertion of the
appointive power, can it be supposed that the court could not or would
not interfere, on the flimsy pretext that the President and senate had
exerted a political power?  It could and would interfere, not on a prin-
ciple of paramount authority, but on the transcending principle that the
judiciary is the guardian of the Constitution in the last resort.

It is not in any respect necessary to mention specially the powers of
the executive that are constitutionally exclusive.  In Foster and Elam
v. Nulson, 2 Peters, 253, the controversy arose on the treaty of San Ilde-
fonso, of October 1, 1800, by which Spain ceded Louisiana to France,
and the treaty of Paris of April 30, 1803, ceding it to the United
States.  The United States, under these, claimed the country between
the Iberville and Perdido.  Spain repelled the claim.  Foster and Elam

for existing rights, or changing remedy, is not a retrospective law prohibited.
De Cordova v. Galveston, 4 T., 470; Paschal v. Perez, 7 T., 348; Treasurer
v. Wygall, 46 T., 147; Worsham v. Stevens, 66 T., 89; Parker v. Buckner,
67 T., 20; Odom v. Garner, 86 T., 374; Association v. Newman, 86 T., 380;
Fristoe v. Blum, 92 T., 76; Standifer v. Wilson, 93 T., 232; Capps v. Garvey
(T. C. A.), U. R. C., 1897; Maynard v. Freeman (T. C. A.), U. R. C., 1900.
Statutes are never construed to operate retrospectively unless their plain
language requires it.  Taylor v. Duncan, Dal., 514; Linn v. Scott, 3 T., 67;

claimed land in the disputed country under a grant from Spain be-
tween the dates of those treaties, relying on the sovereignty of Spain
and her interpretation of the treaty of San Ildefonso; thus virtually
calling on the court to settle a contested boundary between nations. Con-
sequently, the court held that, "In a controversy between two nations
concerning national boundary, it is scarcely possible that the courts of
either should refuse to abide by the measures adopted by its own gov-
ernment."

"There being *no common tribunal to decide between them,* each de-
termines for itself its own rights, and if they can not adjust their dif-
ferences peaceably, the right remains with the strongest. The judiciary
is not that department of the government to which the assertion of its
interests as against foreign powers is confided; and its duty *commonly*
is to decide upon individual rights, according to those principles which
the political departments of the nation have established." It was fur-
ther held, "that a treaty is in its nature a contract between two nations
and not a legislative act. In other nations it is carried into operation
by the sovereign; but in the United States it is made a law of the land.
When its performance by either party is to be coerced, the political power
of each State is invoked; but the courts compel obedience on the part
of the citizens of the United States, as to a legislative act, after the
political power has adopted it." All the principles recognized in this
authority are sufficiently satisfactory.

It is not for the courts to settle boundaries between independent
nations, nor to make treaties; but if the treaty be consummated and
become the law of the land, it will be observed and enforced by the courts
as another law. And why not? Do not the admiralty courts enforce
the laws of nations as well as treaties, which are special international
laws? Is, however, the treaty-making power the same as the legislative
power of dividing the country into counties and districts, according to
the limitations of the Constitution, for internal police and municipal
administration? The latter is only an ordinary case of legislation, and
like every other act of that sort, it must comport with the Constitution,
else it is nothing. To the treaty-making power may be referred together
the arguments alluding to the acquisition of Louisiana by the United
States; the admission of Michigan into the North American Union; the
extreme cases put by the learned counsel in argument from those politi-
cal events; and all the instances from every treaty in ancient and modern
times.

I intended a review of the important decisions of the Supreme Court
of the United States cited in the argument; but this opinion is already

Martin v. State, 24 T., 61; Orr v. Rhine, 45 T., 345; Insurance Co. v. Ray,
50 T., 511; Grigsby v. Peak, 57 T., 142; Johnson v. Taylor, 60 T., 360; Mel-
linger v. Houston, 68 T., 37; Rockwall County v. Kaufman County, 69 T., 172;
McGregor v. Goldammer, 2 U. C., 49; Murray v. Gibson, 15 How., 421; Harvey
v. Tyler, 2 Wall., 329; Chewheong v. United States, 112 U. S., 536; Shreve-
port v. Cole, 129 U. S., 36.

too much extended, nor is it in the least degree necessary. Craig v. Missouri, 4 Pet., 410; Worcester v. Georgia, 6 Pet., 515; Rhode Island v. Massachusetts, 12 Pet., 627; Calder v. Bull, 3 Dal., 386; Marbury v. Madison, 1 Cran., 137; Providence Bank v. Billings, 4 Pet., 514; Martin v. Hunter, 1 Wheat., 304; Terrett v. Taylor, 9 Cran., 43; Briscoe v. Bank of Commonwealth of Kentucky, and many other cases that might be consulted, will show with what tenacity and firmness the Supreme Court of the United States has illustrated, vindicated and enforced its own great and essential conservative power of testing the acts of the federative Congress and those of the several States by the principles, the limitations, and standards fixed by the national Constitution. In the last case, Rhode Island v. Massachusetts, it went perhaps further than in any of those that preceded to disregard the position assumed that it was called upon to exert political power in establishing a line between those States; for it was held that controversies between the States were referred by the national compact contained in the Constitution to its decision.

I will not refer specifically to the case in which, in a vague and improvident expression, a definition was essayed of judicial as contradistinguished from political power; nor to that, some fourteen years afterward, declaring that the court had during the interim been departing step by step from the definition, and that it might be regarded as overruled. Indeed, in conclusion, it appears manifest to me, that the act of our Congress creating the territory of Ward, passed by both houses and sanctioned by the former President, is simply a common legislative act; that its validity comes in question before us more directly than any other statutory provision invoked as a criterion of right or rule of decision; and that if under any name or pretext it can be shown that we have no authority to review it in reference to its conformity or conflict with the Constitution, it follows irresistibly that we have not any authority whatever to declare any conceivable act of the Legislature unconstitutional and void. Texas is not yet prepared for such an abandonment of a high trust reposed, though it be vested in the last, the feeblest, and the most dependent branch of the government. Nor will it be yielded whilst the shadow of the name of civil liberty can be discerned. If the effect of the decision of this case should be to repudiate, as unconstitutional, the county of Ward, I am prepared to say, from a principle of necessity, consonant with sound practical sense and distributive justice, however variant from an exquisite chain of sophistries that might be elaborated, that all the judicial and ministerial action, had in

**Note 25.**—Austin v. White & Co., p. 434.

The Legislature may regulate the remedy, both as to pre-existing and subsequent rights, as to them may seem proper; and a statute changing or modifying it is not unconstitutional and does not impair obligation of contracts, unless it fails to provide an adequate remedy. Austin v. Andrews, Dal., 447; Selkirk v. Betts, Dal., 471; Catlin v. Munger, 1 T., 598; Gautier v. Franklin, 1 T., 732; De Cordova v. Galveston, 4 T., 470; Paschal v. Perez, 7 T., 348; Grassmeyer v. Beeson, 13 T., 524, 529; Bender v. Crawford, 33 T., 745, 752; Moore v. Letchford, 35 T., 185, 214; Bentinck v. Franklin, 38 T., 458;

the territory under the seeming sanction of the Constitution and the forms of law, is precisely as valid de facto as if it could have received and had actually received full and separate representation in Congress.

On both grounds, in my opinion, the judgment below ought to be affirmed.

*Affirmed.*

## No. XVII.

### FORBES, BROOKS & CO. v. WILLIAM G. HILL.

(See Note 41.)

*Appeal from Brazoria County.*

MORRIS, JUSTICE.—An execution in favor of Forbes, Brooks & Co. for $839.50 was levied on certain slaves of Hill, who obtained an injunction thereto, alleging that he had "pointed out property" to the sheriff to make levy on; but that the sheriff, with the advice of the plaintiffs in execution, or some one of them, and with the intention of harassing and oppressing the said Hill, failed to levy on the property so designated and proceeded to levy on his slaves.

The answer of Brooks, one of the defendants in the injunction and a partner in the firm of Forbes, Brooks & Co., denies that he gave any instructions to the sheriff, except to levy on property to which Hill had a title, and that he does not believe any other instructions were given by the other partners, one whom has never resided in the Republic, nor had any management of the partnership affairs; and that the other partner is now absent from the country. The sheriff denies all oppressive action or intention on his part in the levy of the execution, and for further answer denies that Hill ever designated or offered to designate any lands belonging to himself to be levied on. The cause came on to be tried at the March term of the District Court for the county of Brazoria, and was submitted to the court; the injunction perpetuated; but "liberty granted (to use the words of the court) to the plaintiff in execution to sue out another execution, having due regard to the grounds upon which this injunction is perpetuated." An appeal is taken to this court.

The fifth section of an act of the Fourth Congress, concerning executions, prescribes: "That all executions shall be made returnable to the next term of the court, and the defendant or his agent in all cases shall have the right to designate the property; and if the defendant shall fail or refuse to designate the same, then the levy shall be made on personal

---

Wood v. Welder, 42 T., 396; Treasurer v. Wygall, 46 T., 447; McLane v. Paschal, 62 T., 102; Ward v. Hubbard, 62 T., 559; Collins v. Warren, 63 T., 311; Parker v. Buckner, 67 T., 20; Boone v. Chambers, 82 T., 480; Odum v. Garner, 86 T., 374; B. and L. Assn. v. Newman, 86 T., 380; Standifer v. Wilson, 93 T., 232; League v. State, 93 T., 553; State v. Williams, 10 T. C. A., 346; Insurance Co. v. Shearman, 17 T. C. A., 456; T. M. Ry. Co. v. Telegraph Co., 24 T. C. A., 198; Etter v. M. P. Ry. Co., 2 App. C., sec. 61; Moore v. State, 20 T. App., 280; Maynard v. Freeman (T. C. A.), U. R. C., 1900; Williams v. Bradley (T. C. A.), U. R. C., 1902. Where a statute gives a new remedy,

or movable property first; then on uncultivated lands; then on slaves," etc. Under this section it is contended that it is not necessary for the defendant to point out *his own property,* and that the sheriff is bound to make the levy on *"property designated,"* whether the defendant have title or not; he (the sheriff) not being the proper person to inquire into the title of the defendant to property thus designated.

We can not believe that a statute should be construed so as to lead to the flagrant and palpable absurdity that an individual can point out the property of another to satisfy a debt of his own. Such a construction would be at war with the plainest dictates of common sense, as well as the usual and legal construction of statutes. True, the exercise of the discretion on the part of the sheriff, of refusing to *levy* on property pointed out by the defendant and to which he asserted a title, might in some instances be used for the purposes of oppression; but there the doors of the courts are always open to restrain, upon proper allegations, such illegal and inequitable proceedings; but in this instance the plaintiff in this bill does not even allege title to property pointed out, and the error originally existing in the granting of the injunction is rendered more glaring in its perpetuation. With regard to the suggestion of counsel that the injunction being perpetuated only as to the particular execution, leave being granted to the plaintiffs in execution to sue out another, no right of the said plaintiff was impaired and no cause existed for appeal, we can only say that the judgment of the court below was final, and the course to be pursued by the party who considered himself aggrieved by that judgment was not liable to the dictation of the court; but a matter of right on which he could exercise his own discretion, and pursue the remedy which the law afforded him by appeal to a higher tribunal. We are therefore of opinion that the judgment of the court below be totally reversed.

*Reversed.*

Chief Justice Hemphill and Judge John T. Mills concur. Judges A. Hutchinson and R. E. B. Baylor say: "We concur in the above opinion, but feel it proper to go further and say that this was not a case for injunction. Each court of original jurisdiction has the necessary control over its final process and the action of its ministerial officer; but this is executed not by injunction but supersedeas, which brings back the process if irregular, or arrests the action of the officer if illegal or oppressive. Here there is no complaint against the judgment for injustice; and wherefore an injunction? The whole case is radically and throughout wrong."

not repugnant nor inconsistent with the old remedy, the latter is not taken away, and parties have their election between the two. Thouvenin v. Rodrigues, 24 T., 468; Etter v. M. P. Ry. Co., 2 App. C., sec. 58; M. P. Ry. Co. v. Parkhurst, 3 App. C., sec. 159. Injunction does not lie to prevent excessive levy. Citizens Nat. Bank v. Interior Land and Im. Co., 14 T. C. A., 301; G. C. & S. F. Ry. Co. v. Holt, 1 App. C., sec. 839.

**Note 26.**—Hall v. Phelps, p. 435.

On dissolution of injunction, plaintiff is entitled to have petition con-

## No. XVIII.

### A. M. TOMPKINS V. THE REPUBLIC.

*Appeal from Harris County.*

HUTCHINSON, JUSTICE.—The appellant was indicted for gaming. In one plea he presented seven matters of fact; impeaching the panel of the jurors, out of whom the grand jury was formed; the venire facias; the mode and materials of the grand inquest, and the competency of one of that body; and an eighth point, in substance a demurrer to the indictment. There was evidence on the matters of fact pleaded—a verdict of guilty—a judgment thereon; and all the questions arising on the plea reserved by the court, as novel and difficult, for decision here.

For brevity, the points will be considered more in the order as presented by the statutes than as disclosed by the record—a practical exposition of the statutes on the subject being desired.

By the thirty-first section of the act organizing the district courts, the first panel and venire facias were obtained. The first or second judge, or alcalde then in commission, was to make and deposit with the clerk of the district and of the county court a list of all the freeholders or householders in the county. The names were to be separated and put in a box to be kept for the purpose; and the first panel was to be drawn by the clerk and sheriff before such judge or alcalde. That section gave the permanent number and some of the qualifications of the jurors, the venire facias, the execution of it, and the penalty on defaulting jurors. By the thirty-second section, at the first term of the district court and ever afterward the clerk and sheriff, in open court, were directed to draw out of the box mentioned a panel for the coming term; and if from any cause it should be omitted, the panel was to be drawn by the clerk and sheriff before a justice of the peace; and in either case, if the person or persons drawn should have removed, the drawing was to be continued until the number thirty-six should be obtained. "And the names of the jurors drawn shall be put into a separate box, to be kept separate until all are drawn." The forty-first section of the act prescribes other qualifications of a juror; but obviously by accident omitted the word "householder." According to the thirty-third section the court, "from the whole number of jurors furnished as aforesaid and attending," should cause a grand jury to be elected as therein prescribed. By the thirty-fifth section, any deficit was allowed to be supplied, by order of the court, from the bystanders.

We are left at conjecture why it was that the judge or alcalde was

---

tinued over for final trial on merits. Horton v. Jones, Dal., 466; Hanchett v. Gray, 7 T., 549; Fulgham v. Chevallier, 10 T., 518; Lander v. State, 12 T., 462; Burnley v. Cook, 13 T., 586; Eccles v. Daniels, 16 T., 136; Sims v. Redding, 20 T., 386; Dangerfield v. Paschal, 20 T., 536; Edrington v. Allsbrooks, 21 T., 186; Dearborn v. Phillips, 21 T., 449; Floyd v. Turner, 23 T., 292; Baldridge v. Cook, 27 T., 565; Grant v. Chambers, 34 T., 573; Aiken v. Carroll, 37 T., 73; Hewett v. Thomas, 37 T., 520; Pullen v. Baker, 41 T., 419; Kelley v.

required, in the first instance, to return to the clerk of the county court a list of the jurors. Let this pass away. It is evident the Legislature intended that the persons—all the persons in each county—who should be freeholders or householders, if otherwise qualified and not specially exempted, should perform jury service. The persons designated to draw the first and all subsequent panels are plainly the clerk of the district court and sheriff. The judicial superintendent is the district judge, in open court; or in a case of pretermission, a justice of the peace. The great object being to subject all of the citizens to the chances of the allotment by drawing, and as judicial superintendence is appointed, and moreover as at each drawing those not residing in the county were to be excluded, it is not unsafe or too assumptive to say that the persons not in the original list, but equally liable to jury service, should be added, and that their names should pass through the first and second urns. In the view of these statutory provisions and of the correlative laws, we deduce these principles as rules of practice:

1. All free male citizens, who are freeholders or householders of the county, should be put on a list to be kept by the clerk of the district court as an archive. It ought to be an alphabetical list in a bound book, in order to be permanent. At each term or drawing those not listed, but having become subject to jury service, ought to be put on the list, and their names deposited in the first box.

2. It is an important duty, and one not to be omitted, that at each term the district court should cause the two boxes or urns and the jury list to be brought into court, and a panel for the coming term drawn; the additional names being first added to the list and deposited in the first urn. On drawing the first name the judge, clerk and sheriff will determine, preliminarily, if he be a citizen and a freeholder or householder. If rejected, the cause of rejection will be noted on the list and the billet cast aside. If received, the name will be entered on the panel, and the billet containing it passed into the second urn. Thus the full panel should be formed. This reception or recognition of the person will not be conclusive of his qualifications as a juror. If he be under or over age, or be specially exempted, he can urge his privilege in court when summoned and attending. If he be a convict, then according to the forty-first section it will be an exception to him on a challenge to the polls, or on the plea of some one prosecuted. As the drawing is an act of the court, the panel ought to be entered on the minutes.

3. If, however, the panel shall not be drawn in court, then it can

---

Whitmore, 41 T., 647; McKay v. State, 44 T., 43; Gaskins v. Peebles, 44 T., 390; Bridges v. Cundiff, 45 T., 437; Watt v. White, 46 T., 338; Snow v. Nash, 50 T., 216; Texas Land Co. v. Turman, 53 T., 619; Hale v. McComas, 59 T., 484; Washington County v. Schulz, 63 T., 32; Love v. Powell, 67 T., 15; Daugherty v. Gibbs, 2 U. C., 255; Wagner v. Edmiston, 1 App. C., sec. 678.

**Note 27.**—McKinney & Williams v. Bradbury, Administrator, p. 441.

The allegata and probata must correspond, and any material variance between them is fatal. The evidence must be confined to the issues made by the pleadings. Mims v. Mitchell, 1 T., 443; McClelland v. Smith, 3 T., 210; Hall v. Jones, 3 T., 305; Guess v. Lubbock, 5 T., 535; Roseborough v. Gorman,

be drawn by the clerk and sheriff before a justice of the peace in the same manner in every respect, and the panel entered on the minute book.

4. When the names in the first urn are exhausted, those in the second should be transferred to the first urn, and thus the process is perpetuated; the list, the billets, and the urns successively reformed and replenished, and the regular rotation of jury service continued.

5. The venire facias is a writ containing the panel and commanding the sheriff to summon the jurors designated. He ought to make a specific return of the names of those notified.

6. If from the number thus summoned and attending there be not enough to form a grand jury, the court can order the sheriff to summon a number of the bystanders that may be sufficient.

7. To prevent exceptions and pleas the court ought to interrogate the jurors, before they are sworn on the grand inquest, as to the qualifications of citizenship and being freeholders or householders.

8. If any one or more of the grand jury be incompetent on account of alienage, or being no resident freeholder or householder, it is a valid challenge to the polls at the formation of the inquest, or a good plea by a defendant against whom the grand jury found a bill.

9. A defendant, prosecuted criminally, is not bound to except or plead to the array or the polls until after he is arrested; and to prohibit objections of that sort subsequent to the election of the grand inquest would be to allow innovations and violations of the laws that would too soon subvert the institution itself.

10. Without passing on each of the points raised and the proof in the case, with a view to ascertain how many of the preceding principles have been violated, it may suffice to say that as one of the grand jury was not a freeholder or householder, the finding of the indictment was invalid.

11. We think the indictment substantial. Let the judgment be reversed.

*Reversed.*

Chief Justice John Hemphill and Judges R. E. B. Baylor and P. C. Jack concur. Judge Judge John T. Mills says: "I am satisfied the judgment should be reversed, and will deliver my opinion at a future day."

---

6 T., 313; Paul v. Perez, 7 T., 338; Horton v. Reynolds, 8 T., 284; Young v. Lewis, 9 T., 73; McGreal v. Wilson, 9 T., 426; Parker v. Leman, 10 T., 116; Smith v. Montes, 11 T., 24; Thompson v. Thompson, 12 T., 327; Gammage v. Alexander, 14 T., 414; Chrisman v. Miller, 15 T., 159; Rogers v. Bracken, 15 T., 564; Dickson v. League, 16 T., 400; Kottwitz v. Bagby, 16 T., 656; Brown v. Martin, 19 T., 343; Parker v. Beavers, 19 T., 406; Lemmon v. Hanley, 28 T., 219; Heilbroner v. Hancock, 33 T., 714; Adams v. Hicks, 41 T., 239; Shipman v. Fulcrod, 42 T., 248; Dean v. Lyons, 47 T., 18; Tarleton v. Dailey, 55 T., 92; Loving v. Dixon, 56 T., 75; Laredo v. Russell, 56 T., 398; Ballew v. Casey, 60 T., 573; Wallace v. Boyce, 62 T., 636; Stewart v. Gordon, 65 T., 344; Middlebrook v. Zapp, 73 T., 29; Cooper v. Laughlin, 75 T., 524; Shiner v. Abbey, 77 T., 1; Morris v. Keisling, 79 T., 141; Moore v. Kennedy, 81 T., 144; Tinsley v. Penniman, 83 T., 54; Cooper v. Conerty, 83 T., 133; Armstrong v. O'Brien, 83 T., 635; Hoffman v. Loan Assn., 85 T., 409; Telegraph Co. v.

## No. XIX.

### L. W. Tinnen v. E. Matthews.

(See Note 42.)

*Appeal from Harris County.*

HEMPHILL, CHIEF JUSTICE.—The action was brought in this case on a note of hand drawn by the appellant in favor of James Weatherford, and by a second indorsement transferred to the appellee. On the first day of the term of the court to which the writ was returnable, the defendant in the court below craved oyer of the note on which the suit was instituted, and the defendant thereof prayed judgment for costs. On the fifth day of the term the entry states that the demurrer of the defendant was overruled and the issue joined submitted to a jury, who returned a verdict for plaintiff for $318. Judgment was entered for not only the amount of said verdict, but for the additional sum of $85.54 as damages for the detention of the debt. A motion was made for a new trial on the ground that the cause was submitted to the jury without answer on the part of the defendant putting in issue any fact whatsoever; that a judgment in default should have been rendered against him; that by law he would have been entitled to a term of three days thereafter to plead any matters in his defense; and that he has a legal and valid defense to the action. The motion for a new trial was overruled, and an appeal has been taken to this court. From the entries in this cause it would seem, that the craving of oyer on the part of the defendant was regarded as a demurrer to the plaintiff's petition. This is doubtless a misentry of the clerk. The distinction between the demand of oyer and the plea in law styled demurrer is so palpable that the possibility of their being confounded by a judicial tribunal can not well be supposed. It will be unnecessary to discuss at length the frivolous distinction by which in the courts, governed purely by the common law, oyer is granted of sealed and is refused of unsealed instruments.

This was an arbitrary difference founded on no solid grounds, and in England at the present time is evaded and rendered nugatory. In that country the judges will in most cases at the demand of the opposite party order the inspection and a copy of unsealed instruments. It may well be doubted whether such a distinction can properly exist under the system of pleading authorized by the laws of this country. The right of oyer under the common law, is founded on the necessity imposed on the opposite party when relying on a deed, bond, etc., as the foundation of the

Smith, 88 T., 9; Robinson v. Moore, 1 T. C. A., 93; G. C. & S. F. Ry. Co. v. Vieno, 7 T. C. A., 347; Quithana v. Smelting Co., 14 T. C. A., 347; G. H. & S. A. Ry. Co. v. Scott, 18 T. C. A., 321; Burnett v. Edling, 19 T. C. A., 711; Masterson v. Bockel, 20 T. C. A., 416; Dutton v. Mason, 21 T. C. A., 389; F. W. & D. C. Ry. Co. v. Rogers, 21 T. C. A., 605; Standart v. Vivion, 22 T. C. A., 144; Cranfil v. Hayden, 22 T. C. A., 656; Jones v. Drug Co., 25 T. C. A., 234; Jones v. Brazile, 1 App. C., sec. 299; Rogers v. Harrison, 1 App. C.,

cause of action, or as a ground of defense, to make profert of the deed, bond, etc. No profert is made of a promissory note, and therefore the right of oyer did not arise. These are technical distinctions of the system of pleading under the common law. Under the simplicity of the system adopted by the statutes of this Republic they must surely be unknown. Our statute prescribing the essential allegation of a petition makes no discrimination between petition on a bond and one on a note. It certainly does not contemplate that profert should be made in the one case and not in the other; and as the basis on which the rights of oyer, technically so called, is swept away, it would seem absurd that this obnoxious distinction should continue to exist. We are, however, of opinion that in all cases where the action or defense is founded on a written instrument, whether sealed or unsealed, the opposite party is on motion before issue joined entitled to inspection of the same, and that the judge below erred in not granting the prayer of the defendant for oyer of the instrument sued on.

The record shows that judgment was entered upon the fifth day of the term. This, we are of opinion, was error. There being no answer, judgment by default should have been taken on the second day of the term; and if in three days thereafter the defendant neither appeared nor filed his answer, definitive judgment should have been given for plaintiff.

The proper construction of the third and fourth sections of the "act regulating civil suits," approved February 5, 1840, does not seem to authorize the renditions of definitive judgment where the defendant does not appear and answer before the sixth day of the term of the court; and consequently the judgment in this cause was premature and in violation of the rights of the defendant.

Another error apparent on the face of the record was alluded to in the argument and brief of counsel. The verdict of the jury is for the sum of $318. Judgment is entered thereon for that amount, and for the additional sum of $85.54 as damages for the detention of the debt. This was unauthorized, as there is no principle of law more firmly established than that the judgment must correspond with the verdict.

It is ordered, adjudged and decreed that the judgment of the court below be and the same is hereby reversed, and that the cause be remanded for a new trial.

*Reversed and remanded.*

---

sec. 495; McArnis v. McIntyre, 1 App. C., sec. 514; Smith v. McGehee, 1 App. C., sec. 940; Winn v. Sloan, 1 App. C., sec. 1107; Walker v. Simkins, 2 App. C., sec. 70; T. & P. Ry. Co. v. Wheat, 2 App. C., sec. 166; T. & N. O. Ry. Co. v. Oates, 2 App. C., sec. 618; G. C. & S. F. Ry. Co. v. Witt, 2 App. C., sec. 774; M. P. Ry. Co. v. Teague, 2 App. C., sec. 780; Henry v. Fay, 2 App. C., sec. 834; Ross v. Hawley, 3 App. C., sec. 107; Land Co. v. Jones, 3 App., sec. 271; McDannell v. Horrell, 1 U. C., 524.

**Note 28.**—Austin v. Andrews, Administrator, p. 447.

The Legislature may regulate the remedy, both as to pre-existing and subsequent rights, as to them may seem proper; and a statute changing or modifying it is not unconstitutional and does not impair obligation of contracts, unless it fails to provide an adequate remedy. Austin v. White, Dal., 434; Selkirk v. Betts, Dal., 471; Catlin v. Munger, 1 T., 598; Gautier v.

# JUNE TERM, 1843.

## No. I.

### BARTHOLOMEW MANLOVE v. THOMAS KINNEY.

#### (See Note 43.)

*Appeal from Bastrop.*

HEMPHILL, CHIEF JUSTICE.—In this case no notice of appeal was given in the court below, nor was any bond filed.

There is then no foundation for the exercise of the jurisdiction of this tribunal, and the case is accordingly ordered to be removed from the docket.

## No. II.

### WM. H. McGILL AND WIFE v. A. C. DELAPLAIN,

### ADMINISTRATOR, ETC.

#### (See Note 44.)

*Appeal from Bastrop.*

BAYLOR, JUSTICE.—Rebecca Pincena while a feme sole filed her petition in the probate court for Bastrop County, alleging that A. C. Delaplain, administrator of William Brisbone, deceased, was indebted to her in the sum of $738.16, for and on account of work and labor performed by her for the said William Brisbone, deceased, in his lifetime, at his special instance and request, and for money had and received by him to her use, and so forth.

Upon an investigation of the matter in the probate court, she recovered a judgment and decree for the sum of $441.30 against Delaplain, administrator, as aforesaid. From which judgment and decree the said Delaplain appealed to the District Court for Bastrop County.

On the trial of the case there, the said Rebecca Pincena, who had then intermarried with Wm. H. McGill, proved by Andrew Mays, a witness, that there was a balance due the plaintiff for work and labor done and performed by the said Rebecca for the said Brisbone in his lifetime. They also produced in evidence an account, stated to be found among the papers of William Brisbone, deceased, containing a statement of moneys received by him as guardian for the said Rebecca upon an attempted settlement in the State of Mississippi, from whence the said Brisbone, deceased, removed to Texas, bringing with him the said Rebecca, who was

Franklin, 1 T., 732; De Cordova v. Galveston, 4 T., 470; Paschal v. Perez, 7 T., 348; Grassmeyer v. Beeson, 13 T., 524, 529; Bender v. Crawford, 33 T., 745, 752; Moore v. Letchford, 35 T., 185, 214; Bentinck v. Franklin, 38 T.,

then a minor. The foregoing evidence being submitted to the jury, the defendant by his counsel moved the court to nonsuit the plaintiff and dismiss the case; which motion was sustained by the court below, and judgment rendered accordingly against McGill and wife; to reverse which they prayed an appeal to this court, and object here, that after the introduction of testimony showing a strong presumption in favor of the plaintiff's right to recover, it was not competent for the judge below to take the case from the jury and dismiss the petition or nonsuit the plaintiff on the ground of insufficiency of proof, etc.

We think the objection well taken. At a former term of this court, in the case of Guest v. Guest, we decided that the district court had no power to compel the party to take a nonsuit; we see no good reason to depart from this decision.

It has been argued by the counsel for the appellee that at the time the judgment of the court below was rendered, the civil law prevailed, and by that law, the judge below had the power to nonsuit the plaintiff. It is true where the civil laws prevails, there are cases to be found to that effect. But by our Constitution and laws we think the trial by jury was secured to the plaintiffs if they chose to persist in it. The judgment and decree of the court below must therefore be set aside, annulled and reversed, and a new trial awarded in the court below.

*Reversed and remanded.*

### No. III.

#### ALLCORN, ADMINISTRATOR, ETC., v. SWEENY.

(See Note 45.)

*Appeal from Brazoria.*